UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| OMEGA HOSPITAL, LLC,<br><br>    Plaintiff,<br><br> v.<br><br>UNITED HEALTHCARE SERVICES, INC.,<br>and UNITED HEALTHCARE OF<br>LOUISIANA, INC.,<br><br>    Defendants. | Case No. 3:16-cv-00560-JWD-EWD |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AND TO STRIKE PORTIONS OF THE SECOND AMENDED COMPLAINT**

---

Errol J. King, Jr.
Katherine L. Cicardo
PHELPS DUNBAR LLP
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70801
(225) 381-9197

Kevin D. Feder (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

Amanda L. Genovese (*pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
agenovese@omm.com

*Attorneys for Defendants*
*United HealthCare Services, Inc.,*
*UnitedHealthcare of Louisiana, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

PROCEDURAL AND FACTUAL BACKGROUND.................................................... 3

    I.      PROCEDURAL BACKGROUND........................................................ 4

          A.      Omega's Original Complaint and FAC ................................... 4

          B.      Omega's Motion for Leave to Amend and the Discovery Orders ............ 4

               1.      Operative claims list ................................................... 5

               2.      Production of plan documents ...................................... 6

               3.      Assignment of benefits forms ...................................... 7

    II.     FACTUAL BACKGROUND ............................................................... 7

          A.      The Parties ............................................................................ 7

          B.      Claims Payment, Audit, and Overpayment Notices ............... 9

          C.      Appealing Benefits Determinations..................................... 10

          D.      Overpayment Recovery ....................................................... 10

          E.      Omega's Claims.................................................................. 10

ARGUMENT .......................................................................................................... 12

    I.      ALLEGATIONS RELATED TO A-PATIENTS SHOULD BE STRICKEN .................................................................................... 12

    II.     OMEGA LACKS STANDING TO BRING THIS CASE AS AN ASSIGNEE ..................................................................................... 12

          A.      Omega Has Failed to Produce Assignments for Most of the Claims at Issue. ......................................................... 14

          B.      Many of Omega's Purported Assignments Lack the Requisite Connection to the Dates of Service at Issue to be Facially Valid. ........... 15

          C.      The Purported Assignments are Void Due to Anti-Assignment Provisions................................................... 16

          D.      Even if Omega's Assignments Were Valid, Omega Cannot Bring a Claim for Forward-Looking Relief (Count Three). ................................. 17

    III.    OMEGA FAILS TO STATE PLAUSIBLE ERISA CLAIMS........................... 18

          A.      Count One Suffers From Fatal Pleading Defects...................................... 18

          B.      Omega Does Not Plausibly Allege a Violation of ERISA. .................... 19

          C.      Omega's State Law Claims (Counts Three and Four) Fail...................... 21

                1.      Counts Three and Four are preempted by ERISA ...................... 21

                2.      Omega's breach of contract claim fails as a matter of law ......... 23

**TABLE OF CONTENTS**
**(continued)**

                                                                          **Page**

        3.     Count Three is preempted and implausible ................................. 24

    IV.    OMEGA'S JURY DEMAND SHOULD BE STRICKEN ................................. 24

CONCLUSION ........................................................................................................ 24

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*,
  662 F.3d 376 (5th Cir. 2011) ................................................ 22

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004)........................................................... 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................... 18

*Bell Atl. Corp., v. Twombly*,
  550 U.S. 544 (2007)........................................................... 18

*BioHealth Med. Lab., Inc. v. Cigna Health and Life Ins. Co*.,
  2016 WL 375012 (S.D. Fla. Feb. 1, 2016), *aff'd in part and vacated in part for other reasons
  by* 706 F. App'x 521 (11th Cir. 2017) .................................... 23

*Borst v. Chevron Corp*.,
  36 F.3d 1308 (5th Cir. 1994) ................................................ 24

*Causey v. Sewell Cadillac-Chevrolet, Inc*.,
  394 F.3d 285 (5th Cir. 2004). ............................................... 3

*Cell Sci. Sys. Corp. v. La. Health Serv.*,
  —F. App'x—, 2020 WL 1285033 (5th Cir. Mar. 17, 2020) ........................... *passim*

*Clancy v. Emp'rs Health Ins. Co.*,
  82 F. Supp. 2d 589 (E.D. La. 1999)..................................... 22, 23

*Ctr. for Restorative Breast Surgery, L.L.C. v. Blue Cross Blue Shield of La.*,
  2016 WL 4208479 (E.D. La. Aug. 10, 2016) .............................. 14

*Denham Homes, L.L.C. v. Teche Fed. Bank*,
  182 So. 3d 108 (La. Ct. App. 2015)....................................... 23

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*,
  938 F.3d 246 (5th Cir. 2019) ........................................... 13, 16

*Dudley v. Sedgwick Claims Mgmt. Servcs. Inc.*,
  495 F. App'x 470 (5th Cir. 2012) ........................................... 6

*Egelhoff v. Egelhoff ex rel. Breiner*,
  532 U.S. 141 (2001)........................................................... 22

*Finley v. Special Agents Mut. Ben. Ass'n, Inc.*,
  957 F.2d 617 (8th Cir. 1992) ................................................ 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Frank v. Shell Oil Co.*,
   828 F. Supp. 2d 835 (E.D. La. 2011) ...................................................... 12

*Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*,
   426 F.3d 330 (5th Cir. 2005) ............................................................ 13

*Hermann Hosp. vs. MEBA Med & Benefits Plan*,
   845 F.2d 1286 (5th Cir. 1988) .......................................................... 13

*Houston Home Dialysis, LP v. Blue Cross & Blue Shield of Tex.*,
   2018 WL 2562692 (S.D. Tex. June 4, 2018) .......................................... 19

*In re Managed Care Litig.*,
   298 F. Supp. 2d 1259 (S.D. Fla. 2003) ................................................ 15

*Infoneuro Grp. v. Aetna Life Ins. Co.*,
   2019 WL 3006549 (C.D. Cal. May 3, 2019) .......................................... 16

*Kerfoot v. FNF Servicing, Inc.*,
   2013 WL 5797662 (M.D. Ga. Oct. 25, 2013) ........................................ 23

*Koehler v. Aetna Health Inc.*,
   683 F.3d 182 (5th Cir. 2012) ......................................................... 6, 24

*Krim v. pcOrder.com, Inc.*,
   402 F.3d 489 (5th Cir. 2005) ............................................................ 13

*Ledet v. Campo*,
   128 So. 3d 1034 (La. Ct. App. 2013) .................................................. 23

*Lee v. Verizon Commc'ns, Inc.*,
   837 F.3d 523 (5th Cir. 2016) .............................................................. 1

*Louisiana Health Service & Indemniy Co. v. Rapides Healthcare System*,
   461 F.3d 529 (5th Cir. 2006) ......................................................... 16, 17

*Lovelace v. Software Spectrum, Inc.*,
   78 F.3d 1015 (5th Cir. 1996) ............................................................ 18

*Manuel v. Turner Indus. Grp., L.L.C.*,
   905 F.3d 859 (5th Cir. 2018) ............................................................ 20

*Menchaca v. Chrysler Credit Corp.*,
   613 F.2d 507 (5th Cir. 1980) ............................................................ 13

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Meyers v. Textron, Inc.*,
  540 F. App'x 408 (5th Cir. 2013) ............................................................ 3

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
  136 S. Ct. 651 (2016) ........................................................................... 21

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
  514 U.S. 645 (1995)), *aff'd en banc*, 698 F.3d 229 (5th Cir. 2012) ....................... 22

*Paterson v. Weinberger*,
  644 F.2d 521 (5th Cir. 1981) ................................................................ 15

*Peterson v. UnitedHealth Grp. Inc.*,
  242 F. Supp. 3d 834 (D. Minn. 2017) ..................................................... 4, 13

*Peterson v. UnitedHealth Grp. Inc.*,
  913 F.3d 769 (8th Cir. 2019) ................................................................ 20

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987) ............................................................................. 22

*Poe v. United Ass'n of Journeyman & Apprentices of the Plumbing & Pipefitting Indus. of the
  United States of Am. AFL-CIO Local 198 Health & Welfare Fund*,
  2019 WL 4855158 (M.D. La. Oct. 1, 2019) ............................................... 22

*Premier Health Ctr. P.C. v. UnitedHealth Grp.*,
  292 F.R.D. 204 (D.N.J. 2013) ........................................................... 15, 18

*Quality Infusion Care, Inc. v. Health Care Serv. Corp.*,
  628 F.3d 725 (5th Cir. 2010) ................................................................ 20

*Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*,
  858 F.3d 340 (5th Cir. 2017) ................................................................. 6

*Rivera v. Robinson*,
  2019 WL 1326588 (E.D. La. Mar. 25, 2019) ............................................... 12

*Sanga v. Perdomo*,
  167 So. 3d 818 (La. Ct. App. 2014) ......................................................... 23

*Skyy v. City of Arlington*,
  712 F. App'x 396 (5th Cir. 2017) ............................................................ 3

*Sleep Lab at W. Houston v. Tex. Children's Hosp.*,
  2015 WL 3507894 (S.D. Tex. June 2, 2015) ............................................... 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Sublett v. Premier Bancorp Self Funded Med. Plan*,
   683 F. Supp. 153 (M.D. La. 1988) .......................................................................... 24

*Tango Trans. v. Healthcare Fin. Servs.*,
   322 F.3d 888 (5th Cir. 2003) ................................................................................... 13

*Tex. Life, Acc. Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't Co.*,
   105 F.3d 210 (5th Cir. 1997) ................................................................................... 15

*Univ. Spine Ctr. v. Empire Blue Cross Blue Shield*,
   2018 WL 615676 (D.N.J. Jan. 29, 2018) ................................................................. 16

*Univ. Spine Ctr. v. United Healthcare*,
   2018 WL 2332204 (D.N.J. May 23, 2018) ................................................................. 6

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ................................................................................................ 19

*Washington v. Murphy Oil USA, Inc.*,
   497 F.3d 453 (5th Cir. 2007) .................................................................................... 6

This memorandum is respectfully submitted on behalf of Defendants United HealthCare Services, Inc. and UnitedHealthcare of Louisiana, Inc. (collectively, "United") in support of their motion for an order dismissing the Second Amended and Restated Class Action Complaint ("SAC") of Plaintiff Omega Hospital, LLC ("Omega") in its entirety pursuant to Rules 12(b)(1)[1] and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), and striking the jury demand and allegations referencing "A-patients," as described herein, under Rule 12(f).

## PRELIMINARY STATEMENT

Omega was allowed three bites at the apple. Yet, Omega's SAC contains allegations and theories of liability already rejected in its previously dismissed Complaint and First Amended Complaint ("FAC").[2] The history of this case demonstrates why dismissal of the SAC *with prejudice* is warranted.

On September 22, 2017, the Court dismissed Omega's ERISA[3] causes of action because they "lack[ed] necessary specificity and fail[ed] to provide proper factual support for certain allegations." (ECF 38 at 6–7.) On September 11, 2018, the Court again dismissed Omega's ERISA causes of action—this time in the FAC—on the grounds that "Omega lack[ed] derivative standing to assert its [claims for equitable relief[,]" that Omega "failed to allege a plausible claim for benefits under ERISA," and that "the ERISA Plan, itself, is the only proper defendant for [Omega's] Section 503 claim." (ECF 90 at 27, 33, 35.) After dismissing Omega's ERISA causes of action for a second time, the Court declined to exercise supplemental jurisdiction over Omega's

---

[1] In the Fifth Circuit, ERISA standing is a question of subject matter jurisdiction. *See Cell Sci. Sys. Corp. v. La. Health Serv.,* —F. App'x—, 2020 WL 1285033, at **2–3 (5th Cir. Mar. 17, 2020); *see also Lee v. Verizon Commc'ns, Inc.,* 837 F.3d 523, 533 (5th Cir. 2016).

[2] *See* ECF 41 (filed October 20, 2017).

[3] Employee Retirement Income Security Act of 1974 ("ERISA").

1

state law claims ("Second Dismissal Order").[4]  (ECF 90 at 36.)  After the Second Dismissal Order, Omega filed a motion for reconsideration, which the Court denied (the "Reconsideration Order.") (*See* ECF 103.)  The Court, however, allowed Omega to file an amended complaint, but cautioned "Omega of Rule 11" noting that "Omega should be thoughtful of not only the good faith grounds of its amendment, but also judicial economy."  (*Id.* at 29.)  Despite this warning, Omega filed the SAC, a pleading not much different from its previously rejected complaints.[5]  Omega has failed to heed the directive of "avoid[ing] a waste of judicial resources," (*id.* at 29), and has failed to do the bare minimum, including establish standing.

The Reconsideration Order specifically directed that there be "limited discovery" prior to Omega filing the SAC.  (*Id.*)  In a subsequent order implementing the limited discovery, Omega was required to produce (1) an at-issue claims list, with detailed information related to the relevant patients/members, and (2) assignment of benefits forms for each of the claims it was placing at issue.[6]  (ECF 108 at 2.)  In June 2019, Omega produced an initial claims spreadsheet and a month later produced a number of purported assignments.  (*See* Declaration of Amanda L. Genovese ("Genovese Decl.") ¶ 5.)  On August 23, 2019, Omega produced an updated claims spreadsheet, which superseded and modified the earlier-produced spreadsheet.  (*Id.* ¶ 7.)

Under the updated August 23, 2019 spreadsheet, Omega's previously produced assignments related to only 47 claims (ignoring 74 claims entirely).  (*Id.* ¶ 14.)  And, almost all of the purported assignments are facially invalid or void because: (i) certain documents are "payment

---

[4] Omega only places benefits claims governed by ERISA at issue in the SAC.  (*See, e.g.,* SAC ¶ 1 ("Omega Hospital . . . and the members of the putative Class . . . are "out-of-network" health care providers who have furnished healthcare services or supplies to members of ERISA health benefit plan."); *id.* at ¶ 16 ("Because private employers establish the United Group Health Plans at issue, ERISA governs these plans.").)

[5] The Reconsideration Order noted that "were this Court to reconsider the underlying motion to dismiss on the current record without amendment, it would likely be an exercise in futility."  (*Id.* at 20.)

[6] The limited discovery order was clarified (and the deadlines to comply, extended) in a subsequent order. (ECF 113 at 2–3.)

2

agreements," which are *not* assignments of benefits; (ii) many assignments purport to cover multiple dates of service *nowhere near* their execution date; and (iii) there are enforceable anti-assignment provisions in the controlling ERISA plans.  (*Id.* ¶ 15.)  Without valid assignments, Omega lacks standing to prosecute the causes of action in the SAC.

In addition to the fact that Omega lacks standing (the derivative right to sue) for over 90% of the claims it places at issue, each of Omega's causes of action are also subject to dismissal due to Omega's failure to state a cognizable claim.  Finally, Omega's causes of action for "declaratory and injunctive relief"[7] and "breach of contract" are preempted by ERISA and implausible.  The SAC should be dismissed in its entirety and with prejudice.

## PROCEDURAL AND FACTUAL BACKGROUND

For the purposes of its motion to dismiss only, United assumes the truth of the factual allegations in the SAC, except to the extent that they contradict documents incorporated by reference or otherwise integral to the allegations.  United identifies such contradictions herein, and, to aid the Court's review, has attached such documents to the concurrently filed Declaration of Amanda L. Genovese and Declaration of Gretchen R. Hess ("Hess Decl.").[8]

---

[7] Omega does not expressly specify whether its cause of action for "Declaratory and Injunctive Relief" (Count III) is being brought pursuant to ERISA or under state law.  (*See* SAC ¶¶ 83–85.)

[8] "Although a district court primarily looks to the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, . . . a district court may take into account documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013); *see also Skyy v. City of Arlington*, 712 F. App'x 396, 398–99 & n.4 (5th Cir. 2017) (same); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).  A court may also consider facts outside of the pleadings when a party brings a "factual attack" on jurisdiction pursuant to Rule 12(b)(1), because the court must decide such motion "irrespective of the pleadings, and [consider] matters outside the pleadings, such as testimony and affidavits.  *Cell Sci. Sys. Corp.*, 2020 WL 1285033 at *3.

## I.    PROCEDURAL BACKGROUND

### A.    Omega's Original Complaint and FAC

On August 24, 2016, Omega filed its original Complaint.  (ECF 1.)  On September 22, 2017, the Court dismissed two of Omega's claims with prejudice, finding that certain state law claims were preempted by ERISA.[9]  (*See id*.)  The Court also held that the rest of Omega's claims were not pleaded with sufficient specificity for both the individual and class complaints. (*See id.* at 6–7.)  The Court allowed Omega leave to amend its Complaint.  (*Id.* at 9.)

On October 20, 2017, Omega filed the FAC, ostensibly attempting to cure the deficiencies identified in the Court's previous order.  (ECF 41.)  United again moved to dismiss, this time seeking to dismiss the FAC in its entirety.  (ECF 50.)  In the Second Dismissal Order, the Court dismissed Omega's ERISA causes of action for benefits and for failure to provide full and fair review with prejudice for failure to state a claim.  (*See* ECF 90 at 37.)  The Court also dismissed Omega's ERISA causes of action for lack of standing (the derivative right to sue), finding that Omega's assignment of benefits forms do not knowingly assign claims for breach of fiduciary duty *or for forward looking relief*.  (*Id.* at 26–27.)  Having dismissed *all* of Omega's ERISA claims, the Court declined to exercise supplemental jurisdiction over Omega's state law claims.  (*Id.* at 36.)

### B.    Omega's Motion for Leave to Amend and the Discovery Orders

On October 9, 2018, Omega moved for reconsideration of the Second Dismissal Order, or alternatively, leave to amend the Complaint a second time.  (*See* ECF 92-1 at 1–2.)  While the Court denied Omega's motion for reconsideration, it allowed Omega leave to amend. (ECF 103 at 29.)  The Court also found that, in light of the *Peterson* decision,[10] limited discovery

---

[9] Specifically, the Court dismissed Omega's claim asserted under Louisiana's "prompt pay" statute, La. Rev. Stat. 22:1832, and Louisiana's recoupment laws, La. Rev. Stat. 22:1838(B) and (E).  (*See* ECF 38 at 7.)
[10] *Peterson v. UnitedHealth Grp. Inc*., 242 F. Supp. 3d 834 (D. Minn. 2017).

could potentially clarify the issues in the case and Omega's allegations.  (*See* ECF 103 at 24–25.) The Court therefore ordered a status conference to discuss limited discovery, (*id.* at 29), for use in rendering a decision concerning the viability of Omega's forthcoming SAC (the "Status Conference Order").  (ECF 108.)  Omega was ordered to produce two types of information.  (*Id.*)

*First*, Omega was ordered to produce a list of claims that it was placing at issue in the case and identify: patient name, date of birth, social security number; United member number and group number; dates of service; and United claim number.  (*Id.* at 2.)  *Second*, Omega was ordered to produce assignment of benefits forms for the claims identified by Omega's list (outlined *supra*). (*Id.*) The deadline for Omega to comply with these deadlines was subsequently extended nearly three months by the Court.  (*Compare id.*, *with* ECF 113 at 3.)

Concurrently, United was order to produce the following for the at-issue claims identified by Omega: (i) plan documents; and (ii) citations to provisions in the plan documents supporting the proposition that United was authorized to exercise discretion to recover of overpayments by cross-plan offsetting. (ECF 113 at 3.)

  *1. Operative claims list*

On June 10, 2019, Omega produced an initial spreadsheet.  (Genovese Decl. ¶ 5.)  On August 23, 2019, Omega produced an updated claims spreadsheet (the "Claims Spreadsheet"). (*Id.* ¶ 7.)  The Claims Spreadsheet lists claims related *only to B-patients*, and eliminated A-patient claims.[11]  (*Id.*)  In an August 26, 2019 e-mail, Omega's counsel confirmed that the Claims Spreadsheet contained the "full and complete" list of patients for whom Omega was seeking plan

---

[11] The Court already held that A-patients do not have plausible ERISA claims.  (*See* ECF 90 at 32–33.)

documents. (*Id.* ¶ 8.) This issue was subsequently raised and confirmed on multiple occasions. (*Id.* ¶¶ 9–11.)

### 2. *Production of plan documents*

United produced plan documents for the patients/members identified on the Claims Spreadsheet and a chart detailing the provisions of the plan documents allowing for the recovery of overpayments by cross-plan offsetting. (*Id.* ¶¶ 9-10.) On December 5, 2019, four months after United's first production, a month after United's second production, and weeks after producing the plan provision chart, Omega's counsel sent a letter (i) confirming that Omega only identified B-patients and (ii) asking for the productions of plan documents for the identified B-patients. (*Id.* ¶ 21.) On December 6, 2019, United's counsel responded that United produced plan documents in accordance with the Court's order months earlier.[12] (*Id.* ¶ 11.) Omega's counsel did not respond in writing to the letter, nor did Omega raise any issues with United's production of plan documents. (*Id.*)[13]

---

[12] Omega alleges that "United has to date not produced an actual 'Plan' [document] as ordered by the Court" (SAC ¶ 22), having "produced only [Summary Plan Descriptions] and Certificates of Coverage." (*Id.* ¶ 38.) Omega's allegations are red-herrings.

*First*, courts have held that such documents are (i) plan documents and (ii) can be reviewed in the context of analyzing ERISA benefits claims. *See Dudley v. Sedgwick Claims Mgmt. Servcs. Inc.*, 495 F. App'x 470, 471 n.1 (5th Cir. 2012) (treating an SPD as the "plan"); *see also Koehler v. Aetna Health Inc.*, 683 F.3d 182, 185 (5th Cir. 2012) (treating a COC as the plan when its terms were a "verbatim copy of the underlying plan provisions"); *Univ. Spine Ctr. v. United Healthcare*, 2018 WL 2332204 at *2 n.4 (D.N.J. May 23, 2018) (finding that SPD was governing plan document and therefore qualified as the "Plan" for purposes of plaintiff's claim). *Second*, the Fifth Circuit has made it clear that similar arguments by plaintiffs are merely semantic and without merit. *See Washington v. Murphy Oil USA, Inc.*, 497 F.3d 453, 456 (5th Cir. 2007) (held that where the SPD conflicts with the actual plan terms, "the terms of the SPD control and are binding."); *Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340, 344 (5th Cir. 2017) ("When the Plan paid Rhea's medical expenses, its SPD was functioning as both an SPD and a written instrument. That is nothing peculiar: Plan sponsors commonly use a single document to satisfy both requirements[.]"). So, too, here.

[13] Omega did not again mention United's production until its second request for an extension of time to file the SAC on March 28, 2020, where it noted that "[t]he magnitude and complexity of Defendants' discovery responses made it difficult for Plaintiff to comply with the February 17 deadline. Due to this, the Defendant's discovery production took longer to comb through than anticipated." (ECF 128 at 2.) Although it is unclear what Omega means by discovery responses, Omega again does not note any issues with United's productions from approximately six months earlier. (Genovese Decl. ¶ 23.)

3.      *Assignment of benefits forms*

As noted *supra*, Omega only produced assignments for approximately 47 of the 121 claims (dates of service) listed on the Claims Spreadsheet.[14]  Among those 47 purported assignments, only half relate to claims (dates of service) identified by the Claims Spreadsheet.  (Genovese Decl. ¶ 15.)  The remaining produced documents are either (i) not assignments at all (but instead, "payment agreements" not purporting to assign benefits), or (ii) assignments that significantly pre- or post-date the operative dates of service.  (*Id.* ¶ 15.)

On October 29, 2019, United's counsel sent an email noting that "[o]n July 31, 2019, we received an initial, incomplete production of assignment forms; however, Omega has failed to produce the remaining/missing assignment forms," (*Id.* ¶ 16), and sought confirmation that there were "no more remaining/missing assignment forms in Omega's possession." (*Id.*)  After a week of no response, United's counsel replied that "[h]aving received no response, we are proceeding on the assumption that no assignment forms other than the ones produced to date are in Omega's possession." (*Id.*)  Omega's counsel responded that "[y]ou may presume all you wish but seeing as actual discovery has yet to begin you are likely incorrect." (*Id.*)  Omega did not make any additional productions in compliance with the Court's Orders.  (*Id.*)

Omega filed the SAC four months later.  United now seeks dismissal, for a third time.

## II.     FACTUAL BACKGROUND

### A.      The Parties

Omega is a hospital and surgical center in Metairie, Louisiana whose patients include those who have healthcare benefits plans insured and/or administered by United.  (SAC ¶ 19.)  Omega

---

[14] Omega also produced documentation relating to approximately 52 dates of service for patients/members not located on the Claims Spreadsheet.  (Genovese Decl. ¶ 14 n.2.)

treats United insureds on an out-of-network basis, meaning that it does not have a preexisting contract with United concerning reimbursement for medical services. (*Id.* ¶ 4.) Omega purports to bring claims under ERISA on behalf of itself and a putative class of out-of-network healthcare providers. (*Id.* ¶ 51.) Omega brings these claims pursuant to "assignment of benefits" allegedly receive from patients/members. (*Id.* ¶ 4.)

As the relevant claims administrator, United processes claims submitted by or on behalf of these patients and determines the amount each is entitled under the terms of his or her health benefit plan. (*Id.* ¶ 2.) For convenience, United pays patients' benefits, subject to subsequent audit, directly to a provider if directed to do so by the patient or permitted to do so by the plan terms. These payments are often made in cases where there was no assignment of benefits and even where assignment is disallowed (or qualified) by the plan terms.[15] When United pays benefits directly to a provider, it issues a Provider Explanation of Benefits ("PEOBS")[16] explaining the costs allowed under the patient's plan, the costs that are not covered, the patient's deductible and coinsurance obligation, the amount reimbursed by United, and the amount ultimately paid to the provider. (*Id.* ¶ 6 (describing PEOBs); *see also* Genovese Decl. ¶ 30.) Though the SAC does not mention them, United also issues a corresponding Member Explanation of Benefits ("EOB") directly to the patient (or plan member if different) whose claims have been paid. (*See* Genovese Decl. ¶ 31.)

---

[15] Even in cases where a United plan precludes assignment, plan language can reserve the right to pay claims directly to providers. An example is: "You may not assign your Benefits under the Policy to a non-Network provider without our consent. When an assignment is not obtained, we will send the reimbursement directly to you (the Subscriber) for you to reimburse them upon receipt of their bill. *We may, however, in our discretion, pay a non-Network provider directly for services rendered to you.*" (Genovese Decl. ¶ 29 (emphasis added).)

[16] United also issues a substantively similar document called a "Provider Remittance Advice." A Provider Explanation of Benefits and a Provider Remittance Advice shall be referred to as a "PEOB."

### B.    Claims Payment, Audit, and Overpayment Notices

In order to speed up the initial payment of benefits (often, *but not always*, against the backdrop of state "prompt pay" laws), insurers, such as United, sometimes rely on automated systems to process the massive volume of submitted claims in the first instance.  This invariably leads to a certain level of overpayments, which occur for reasons ranging from provider billing errors, to erroneous coordination with other benefits plans, processing errors, and fraud.  To prevent fraud, waste and abuse, United regularly audits and validates paid claims.  (*See* SAC ¶ 7.)

Omega alleges that all of the overpayments at issue are after-the-fact determinations by United that certain past payments were "purportedly [] overpaid because United had purportedly misapplied its reimbursement procedures."  (*Id.*)  These described audits, which generalize the various, discrete reasons for which United may issue an overpayment notice, identify overpayments made on *A-patient* claims.  (*Id.* ¶ 10.)  Omega does not assert any claims related to A-patients in the SAC nor were any A-patients included on Omega's Claims Spreadsheet.

Instead, Omega's causes of action in the SAC involve B-patient claim payments to Omega where United reduced payment in order to recover previously identified and validated overpayments made to Omega on A-patient claims.  (*Id.*)  Omega argues that United reduced payments on these B-patient claims while only providing "a list of A-patient claim numbers . . . and the dollar amount of alleged overpayment."  (*Id.* ¶ 11.)  Omega admits, however, that it already received an "Audit Findings/Overpayment Notification" report for the relevant A-patient claims that were overpaid.  (*See id.* ¶ 45.)  While Omega had previously disputed the "detail" of these A-patient overpayment notifications, Omega never seriously disputed that they received information sufficient to allow them to appeal the overpayment determinations at issue.  (*Id.*)

Omega does not explain or identify any reason why they should receive this information, *for a second time*, when United was administering ERISA plan benefits for B-patients.

### C.     Appealing Benefits Determinations

Not only does Omega admit having received detailed notice of each of the overpayments, it also acknowledges that United provided, and Omega allegedly pursued, member appeals subject to "Audit Findings/Overpayment Notification." (*Id.*)  In addition, Omega alleges that they "also timely appealed from the 'Audit Findings/Overpayment Notification,'" indicating Omega may have also pursued the provider appeal process in parallel to the member's appeal process. (*Id.* ¶ 46.)  Throughout the SAC, Omega provides only a threadbare discussion of its engagement with the appeals process. (*Id.* ¶¶ 45–46.)

### D.     Overpayment Recovery

After United identifies an overpayment to a provider, the provider often agrees that the amount was overpaid and voluntarily returns the overpaid amount by check or by authorizing United to recover the overpayment by offset.  At other times, as is allegedly the case here, the provider is unable or unwilling to provide meaningful support for any dispute concerning the overpaid amount but nonetheless refuses to return the plan's overpaid funds.  In these cases, after all provider appeals are resolved, United may offset the amount it is owed from a subsequent benefit payment to that provider. (*See id.* ¶¶ 47–49.)  Such a recovery is typically accompanied by additional documentation from United explaining the source and the amount of the previous overpayment that is being recovered from the provider by offset. (*See id.* ¶ 11.)

### E.     Omega's Claims

Omega alleges that the process by which United identifies, adjudicates, and then recovers overpayments violates the plan document terms and the procedural requirements of ERISA.

10

(*See, e.g.*, *id.* ¶¶ 67, 80.)  Omega purports to bring claims on behalf of a class that it defines as all healthcare providers in the State of Louisiana who, within the last ten years, provided out-of-network healthcare services to patients covered by an ERISA plan and who are subject to various processes that United allegedly used to recover overpaid benefits.  (*Id.* ¶ 51.)

The SAC asserts ERISA claims in three counts, as well as a claim for breach of contract under Louisiana law.  It is worth noting that, while Omega's claims remain largely similar to those in prior iterations of its Complaint, it now asserts these claims from the perspective of B-patients rather than A-patients.  (*Compare* ECF 41 ¶¶ 20–36 (describing A-patient experiences for its representative claims) *with* SAC ¶¶ 49–51 (describing recoupment against B-patients).)[17]  In Count One, Omega alleges a violation of ERISA § 502 and seeks repayment of all amounts paid to or withheld by United through offset, to estop United from pursuing further recoupment or "cross-plan" offsetting, and payment of attorneys' fees and costs.  (*See id.* ¶¶ 72–73, 75.)  Count Two alleges claims under ERISA § 502(a)(1)(B) and seeks similar relief as Count One. (*See id.* ¶¶ 80, 82.)  In Count Three, Omega seeks declaratory and injunctive relief under ERISA § 502(a)(3)(A) barring United from pursuing future overpayment recovery.  (*Id.* ¶ 85.)  Lastly, in Count Four, Omega alleges that United breached the terms of the ERISA-governed plans at issue and brings a claim for breach of contract under Louisiana law.  (*Id.* ¶¶ 89–90.)  Each of Omega's causes of action are subject to dismissal under Rules 12(b)(1) and 12(b)(6).

---

[17] As discussed in Section I(B)(1) the Claims Spreadsheet includes only information concerning B-patients. (Genovese Decl. ¶ 7.)

11

## ARGUMENT

### I.    ALLEGATIONS RELATED TO A-PATIENTS SHOULD BE STRICKEN

Rule 12(f) provides that "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The decision to grant or deny a motion to strike lies within the sound discretion of the trial court. *See Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 852 (E.D. La. 2011), *reconsideration granted in part on other grounds*, 2012 WL 1230736 (E.D. La. Apr. 12, 2012). A motion to strike should be granted when the challenged allegations are "prejudicial to the defendant or immaterial to the lawsuit." *Id.*

Omega references A-patients throughout the SAC, however, no A-patients were identified in the Claims Spreadsheet. (Genovese Decl. ¶ 7.) Not only has Omega confirmed on at least five occasions that no A-patients are at issue in this case, (*id.* ¶ 6; 8–11), the Court has already held that such patients do not have plausible ERISA claims. (ECF 90 at 32–33.) As a result, allegations related to A-patients, (*see, e.g.*, SAC ¶¶ 65–68, 77, 84), are immaterial[18] and should be stricken. Because each of Omega's causes of action are premised on allegations related to A-patients,[19] Omega's SAC must be dismissed.

### II.    OMEGA LACKS STANDING TO BRING THIS CASE AS AN ASSIGNEE

In the Reconsideration Order, the Court allowed "Omega leave to amend its complaint a second time to establish standing, name additional parties if necessary, and to better state the

---

[18] *See Rivera v. Robinson*, 2019 WL 1326588, at *2 (E.D. La. Mar. 25, 2019) ("'Immaterial' matter is that which 'has no essential or important relationship to the claim for relief or the defenses being pleaded,' *such as superfluous historical allegations*, 'or a statement of unnecessary particulars in connection with and descriptive of that which is material.' 'Impertinent' matter overlaps with 'immaterial' matter and 'consists of statements that do not pertain, and are not necessary, to the issues in question.'" (internal citations omitted) (emphasis added).

[19] *See, e.g.,* SAC ¶¶ 65–68 (premising a claim for benefits on failure to provide fair and full review to overpayment determinations made for A-patient claims), 77 (claiming that Defendants have "no legal right to offset funds previously paid to Omega" on behalf of A-patients), 84 (alleging that United "issued demand letters to Omega . . . to compel repayment of previously paid benefits [made to A-patients]").

claims that it originally asserted," in light of the *Peterson* decision.[20]  (ECF 103 at 27.)  Omega does none of what the Court requested of it, including demonstrating standing.

Dismissal for a lack of subject matter jurisdiction under Rule 12(b)(1) is proper "when the court lacks the statutory or constitutional power to adjudicate the case." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (quotations omitted).  A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is characterized as either a "facial" or a "factual" attack.  *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).  In a "facial attack," allegations of the complaint are taken as true. *See id*.  A "factual attack," however, challenges the existence of jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. *Id.*  When there has been a "factual attack" the plaintiff bears the burden of proving that jurisdiction does in fact exist. *Id.*

The Fifth Circuit has consistently held that a health care provider lacks standing to assert ERISA claims (the derivative right to sue) unless it has a valid assignment of benefits from the participant or beneficiary. *See Tango Trans. v. Healthcare Fin. Servs.*, 322 F.3d 888, 890–91 (5th Cir. 2003); *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 333 (5th Cir. 2005).  Because providers are not statutorily designated as ERISA beneficiaries, they only have standing to sue under ERISA § 502 if a plan beneficiary or participant validly assigns his or her right to benefits under their plan to the provider. *See Hermann Hosp. vs. MEBA Med & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir. 1988).

Here, Omega does not have standing to assert any claims on behalf of plan beneficiaries or participants where it does not have a valid assignment of benefits. *See Dialysis Newco, Inc. v.*

---

[20] *Peterson*, 2019 WL 1578750, at *2 (D. Minn. Apr, 12, 2019).

*Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 249 (5th Cir. 2019) (concluding that a district court lacks jurisdiction where the provider cannot demonstrate standing through a valid assignment of benefits). Each of Omega's causes of action are premised on Omega being an alleged assignee:

- "Each Omega patient executes the Assignment of Benefits," (SAC ¶ 21);
- "The Assignment of Benefits confers standing on Omega, and the respective Class members, to pursue claims under ERISA, and to file suit as necessary to recover reimbursements, benefits, or other amounts," (*id.* ¶ 23);
- "Such claims are viable ERISA Section 502(A)(1)(b) benefit claims which may be asserted by Omega and the putative Class members under the assignments of benefits the healthcare providers receive from their patients," (*id.* ¶ 80); and
- "United has breached the plan contract between United and the plan beneficiaries (and their healthcare providers where acting pursuant to a valid assignment)," (*id.* ¶ 90).

For reasons set forth below, Omega's SAC should be dismissed pursuant to Rule 12(b)(1).

## A.    Omega Has Failed to Produce Assignments for Most of the Claims at Issue.

Despite the Court's order requiring Omega to marshal proof of valid assignments of benefits for the claims it is purportedly placing at issue in this case, Omega has failed to do so. (Genovese Decl. ¶ 17.) As noted *supra*, on August 23, 2019, Omega produced the Claims Spreadsheet, the operative list of 121 claims for B-patients. (*Id.* ¶ 7.) The only purported assignments produced by Omega relate to 47 claims on the Claims Spreadsheet. For some of these claims, however, Omega did not produce assignments at all, but instead "payment agreements." (*Id.* ¶ 15.) While these payment agreements acknowledge that the signatory "ha[s] executed the Assignment of Benefits . . . simultaneously with my execution of this Payment Agreement," they are not, themselves, an assignment of benefits. (*See, e.g.*, Genovese Decl. ¶ 14, Ex. H at 1.) Thus, with respect to 81 claims, Omega has failed to produce any assignment of benefits and those claims should be dismissed. *See Ctr. for Restorative Breast Surgery, L.L.C. v. Blue Cross Blue Shield of La.*, 2016 WL 4208479 at *3 (E.D. La. Aug. 10, 2016) (court held that plaintiff lacked standing

where it failed to produce an assignment); *Premier Health Ctr. P.C. v. UnitedHealth Grp.*, 292 F.R.D. 204, 219 (D.N.J. 2013) (same).

Similarly, under a "factual attack" on jurisdiction, as described in the Second Dismissal Order, (ECF 90 at 7 (quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981))), Omega was required to "submit facts through some evidentiary method and . . . prove by a preponderance of the evidence that the trial court does have subject matter jurisdiction." (*Id.* (alterations omitted).) For this additional reason, Omega's failure to produce *any* assignments for 81 of the at-issue claims should result in dismissal of each of the 81 claims. *See in re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1292 (S.D. Fla. 2003) (noting that the court's "finding [of jurisdiction] is contingent upon production of valid subscriber assignments from the Provider-Assignee subclass," and holding that absent production of "proof of a valid assignment from patients, the derivative standing doctrine does not apply to those providers.").

**B.    Many of Omega's Purported Assignments Lack the Requisite Connection to the Dates of Service at Issue to be Facially Valid.**

Of Omega's remaining 40 claims, 15 are brought pursuant to assignments that were executed *up to ten years before or after* the claimed date of service. (*See* Genovese Decl. ¶ 15.) These gaps in time make it clear that patients did not "expressly and knowingly" assign claims related to dates of service different from the date on which the assignment was executed. *See Tex. Life, Acc. Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't Co.*, 105 F.3d 210, 218 (5th Cir. 1997) ("It is essential to an assignment of right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee.") (quoting Restatement (Second) of Contracts § 324 (1981)).

Courts have rejected arguments that assignments can provide derivative standing in perpetuity for claims with dates of service removed from the date the assignment was executed. *See Infoneuro Grp. v. Aetna Life Ins. Co.*, 2019 WL 3006549, at *6 (C.D. Cal. May 3, 2019); *see also Univ. Spine Ctr. v. Empire Blue Cross Blue Shield*, 2018 WL 615676, at *2 (D.N.J. Jan. 29, 2018). Most analogous to the instant case is *Infoneuro*, where the plaintiffs attempted to "assert[] that [eleven] AOBs cover twenty-three . . . claims subject to [the Motion to Dismiss]." 2019 WL 3006549, at *6. Rejecting this argument, the court found that the only potentially valid assignment was the claim "in which the plan beneficiary signed an AOB *on the date* [plaintiff] performed a medical service." *Id.* (emphasis in original). At least one other court has similarly found that even a moderate gap between the assignment date and the date of service renders an assignment facially invalid. *See Univ. Spine Ctr.*, 2018 WL 615676 at *2 ("[T]he assignment upon which Plaintiff relies is dated nearly a month prior to the medical services provided . . . This is insufficient to show a valid assignment from Patient to Plaintiff. As such, Plaintiff has not adequately pled that it has standing to assert claims under ERISA 5029(a).").

Omega here attempts to use 23 assignments to cover 40 dates of service, (Genovese Decl. ¶¶ 14–15), however, even a cursory review of those assignments make clear that Omega does not have facially valid assignments for 15 of the 40 dates of service. (*Id*. ¶ 15.) Those claims should be dismissed.

### C. The Purported Assignments are Void Due to Anti-Assignment Provisions.

Since the Second Dismissal Order, the Fifth Circuit's decision in *Dialysis Newco* has confirmed the enforceability of anti-assignment provisions. Thus, the Court's previous reliance on precedent pre-dating *Dialysis Newco*, such as *Louisiana Health Service & Indemniy Co. v. Rapides Healthcare System,* 461 F.3d 529 (5th Cir. 2006), is no longer applicable here.

In *Dialysis Newco*, the Fifth Circuit held that (i) an anti-assignment provision "unambiguously prohibits assignment," (938 F.3d at 252), (ii) allowing patients to authorize direct payments to providers does not conflict with anti-assignment provisions and/or render them invalid, (*id*. at 254), and (iii) a form signed by a patient that merely authorizes a direct payment to a provider *does not convey the separate and distinct right to sue for those payments.* (*Id*. at 255.) The Court also held that a provision of Tennessee law purporting to invalidate an anti-assignment clause was preempted by ERISA. (*Id.* at 256.)[21] In the wake of *Dialysis Newco*, last month, the Fifth Circuit again confirmed that there can be no valid assignment of benefits when a controlling plan includes an anti-assignment provision. *See Cell Sci. Sys. Corp.*, 2020 WL 1285033, at *4.

Of Omega's remaining 25 claimed dates of service, 15 relate to plans that contain provisions that both preclude assignment (anti-assignment provisions), and grant discretion to pay providers directly—such as Omega—even in the absence of a valid assignment.[22] Under recent Fifth Circuit precedent, these provisions are enforceable and the anti-assignment provisions in the plans void any assignments that Omega purports to hold.[23]

### D.    Even if Omega's Assignments Were Valid, Omega Cannot Bring a Claim for Forward-Looking Relief (Count Three).

Although Omega no longer asserts a cause of action based on a breach of fiduciary duty owed to plan participants under ERISA, in Count Three, Omega still seeks to enjoin United from

---

[21] The Tennessee Statute at issue in *Dialysis Newco* bore some resemblance to the Louisiana law that was at the center *Rapides.*

[22] *See* Genovese Decl. ¶ 28, Ex. M at M8-9, M20-21, M31-32, M43-44, M53, M66-67, M80-81, M87, M97-98, M109-10, M 116, M122, M138, M150-51, M161-62, M175-76, M187, M189-99, M213.

[23] Omega's boiler-plate allegations of waiver or estoppel related to anti-assignment provisions are routinely rejected by courts in the Fifth Circuit. *See Cell Sci. Sys. Corp.*, 2020 WL 1285033, at *5; *see also Sleep Lab at W. Houston v. Tex. Children's Hosp.*, 2015 WL 3507894 at *4 (S.D. Tex. June 2, 2015) (finding that an estoppel or waiver argument was "unpersuasive . . . because the complaint as currently drafted contains no facts about the parties' course of conduct . . . that would allow the court to conclude that defendant has in fact waived or is estopped from relying on the Plan's anti-assignment provision.").

17

continuing to engage in recovering overpayments "or other fund offsets" with respect to Omega and members of the purported class. (*See* SAC ¶¶ 83–85.) The Court already held in the Second Dismissal Order that the "assignment of benefits from a patient . . . cannot logically imply the right to assert ERISA claims for injunctive relief on behalf of that patient for services he or she may receive from other providers in the future." (ECF 90 at 24 (quoting *Premier Health* at 219).) Consistent with the Court's prior decision,[24] Omega lacks standing to assert a claim for declaratory or injunctive relief in Count Three regardless of whether it holds valid assignments. Omega's Count Three must therefore be dismissed with prejudice.

## III.    OMEGA FAILS TO STATE PLAUSIBLE ERISA CLAIMS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp., v. Twombly*, 550 U.S. 544, 570 (2007)). As noted, *supra*, the Court may consider "the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

Here, each of Omega's ERISA causes of action, including Counts Three and Four for "declaratory and injunctive relief" and "breach of contract," fail as a matter of law.

### A.    Count One Suffers From Fatal Pleading Defects.

After the Second Dismissal Order, Omega decided not to continue to press the issue of failure to provide full and fair review under 29 U.S.C. § 1133 as a stand-alone claim; rather it decided to fold this issue into their "claim for benefits." (*See* SAC ¶¶ 65–71.) Despite trying to

---

[24] Omega, again, rejected the Court's directive to be "thoughtful of not only the good faith grounds of its amendment, but also judicial economy." (ECF 103 at 29.)

side-step the Court's prior decision, (ECF 90 at 36), holding that § 1133 does not provide a stand-alone cause of action for compensatory relief, Omega *still* cites 29 C.F.R. § 2560.503-1(g) & (h) to support its purported ERISA cause of action in Count One.  (*See id.* ¶¶ 65–66.)  Omega tries to dress up a claim that the Court has previously rejected, and the effort is ineffective.  Omega also continues to ignore this Court's holding that "the ERISA Plan, itself, is the only proper defendant in a Section 503 claim."  (*Id.* at 35.)

Because the Court has already determined that both of these defects are fatal to Omega's claims under 29 U.S.C. § 1133, Count One must be dismissed.[25]

### B.    Omega Does Not Plausibly Allege a Violation of ERISA.

In the Second Dismissal Order, the Court dismissed Omega's ERISA claims seeking ERISA benefits because Omega did not plausibly allege claims on behalf of A-patients. (ECF 90 at 32 ("Omega [has not] alleged that the representative Plans at issue . . . ever executed cross-plan offsets in making their payments to Omega.").)  Although Omega now purports to bring claims exclusively on behalf of B-patients, its causes of action seeking benefits under ERISA remain implausible under Omega's theories of liability.[26]

First, Omega argues that the language in the plan documents, which it groups into three "categories," does not permit cross-plan offsetting.  (SAC ¶¶ 39-41.)  Even taking Omega's

---

[25] ERISA § 503 does not provide a private right of action for damages, which Omega seek here.  (*See* ECF 90 at 35); *Houston Home Dialysis, LP v. Blue Cross & Blue Shield of Tex.*, 2018 WL 2562692, at *6 (S.D. Tex. June 4, 2018) (stating that "ERISA § 503 does not create a private right of action for monetary damages" and citing additional cases).  Also, to the extent Omega purport to bring this claim under ERISA § 502(a)(3), the claim duplicates Omega's claims under § 502(a)(1)(B) and must be dismissed.  This is because if an ERISA plaintiff brings an action under § 1132(a)(1)(B), that plaintiff cannot also maintain an action under § 1132(a)(3), as intended § 1132(a)(3) as a "catchall" provision, authorizing "appropriate equitable relief" only when a plaintiff has no other available remedy. *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

[26] Omega walks back its previous allegations in the original Complaint and FAC that cross-plan offsetting inherently violates ERISA.  (*See* SAC ¶ 79 ("United's act of offsetting previously paid benefits against reimbursements owed to Omega . . . [is] in violation of both the plan terms and ERISA *procedural* guidelines") (emphasis added).)

categorizations on their face, Omega's allegations do not plausibly state a claim.[27]  This is because

the plan language variations Omega cites as allegedly precluding recovery by offset, (*id.* ¶ 40),[28]

each include key terms that have been held by the Fifth Circuit to create a contractual right to

recover overpayments through both same-plan and cross-plan offsetting.  *See Quality Infusion

Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 730 (5th Cir. 2010).[29]  Thus, based on the

terms in the plan documents, Counts One, Two, and Four seeking benefits under Section

502(a)(1)(B) should be dismissed.

Second, Omega suggests that *Montanile* somehow restricts United's ability to recover

overpayments by engaging in cross-plan offsetting.  (SAC ¶ 70 (citing *Montanile v. Bd. of Trs. of

Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016)).)  Not so.  *Montanile*, and the

Fifth Circuit's application of it in *Manuel*, concern limitations on relief available to plans that sue

for equitable relief under ERISA § 502(a)(3).  *See Manuel v. Turner Indus. Grp., L.L.C.*, 905 F.3d

859, 873 (5th Cir. 2018).  These decisions are predicated on an interpretation of Section 502(a)(3)'s

"appropriate equitable relief" provision in a litigation setting.  They have no bearing on what non-

judicial mechanisms for recovery of overpayments are available to administrators of ERISA plans.

Further, applying *Montanile* to non-judicial processes would be unprecedented and absurd, as its

_____

[27] Omega's categories ignore plan language that clearly supports cross-plan offsetting.  (*See, e.g.*, Genovese Decl., Ex. M ("We may, however, in our discretion, pay a non-Network provider directly for services rendered to you. In the case of any such . . . payment to a non-Network provider, we reserve the right to offset Benefits to be paid to the provider by any amounts that the provider owes us.").)  Attached as Exhibit K to the Genovese Declaration is a true and correct redacted copy of United's plan provisions chart supporting the proposition that United has discretion and the right to recover overpayments by cross-plan offset.

[28] Every plan related to a claim for which Omega has produced an assignment (including those for which it has produced a temporally invalid assignment) includes language identical or materially similar to the language cited by Omega in Paragraph 40 of the SAC.

[29] The only case where such language has been held to not permit recovery of overpayments through cross-plan offsetting explicitly rejected Fifth Circuit precedent in its analysis.  *See Peterson v. UnitedHealth Grp. Inc.*, 913 F.3d 769, 776 n.5 (8th Cir. 2019).  Instead, it used an Eighth Circuit-specific "*Finley*" analysis, which has not been adopted or endorsed by any court in the Fifth Circuit.  (*Id.* at 775–76 (quoting *Finley v. Special Agents Mut. Ben. Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992)).)

limitation on recovery to "traceable assets" would preclude not only cross-plan recovery but also same-plan offsetting in nearly every case, regardless of plan language. Omega's attempt to wrench *Montanile* out of the Section 502(a)(3) context does nothing to salvage its claims.

For the foregoing reasons, Omega's ERISA causes of action must be dismissed as implausible.

### C. Omega's State Law Claims (Counts Three and Four) Fail.

In the Second Dismissal Order, the Court declined to exercise supplemental jurisdiction over non-ERISA benefits claims. (ECF 90 at 36.) However, that issue is no longer in play, as Omega only places ERISA benefits claims at issue in the SAC. (*See, e.g.,* SAC ¶¶ 1, 16.)

Moreover, Omega's causes of action in Counts Three and Four for "declaratory and injunctive relief" and "breach of contract" are merely claims for benefits or forward-looking relief under ERISA. However, even if the Court were to consider Counts Three and Four as common-law causes of action, such claims (i) are preempted by ERISA, and (ii) fail as a matter of law.

#### 1. *Counts Three and Four are preempted by ERISA*

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). ERISA contains two preemption clauses. First, § 502(a) allows a beneficiary or participant of an ERISA-regulated plan to bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "If state causes of action that supplement the ERISA § 502(a) remedies were permitted," that would undermine "Congress' intent to make the ERISA civil enforcement mechanism exclusive." *Davila*, 542 U.S. 200 at 216. Second, § 514(a) is far-reaching and explicitly "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit

plan." *Id.* at § 1144(a). The phrase "relates to" is "deliberately expansive," and "designed to establish plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) (quotation omitted). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (internal quotation omitted).[30]

Count Three for "declaratory judgment and injunctive relief" is premised on Omega's allegations that "United failed to comply with . . . ERISA requirements." (SAC ¶ 84.) Accordingly, Count Three unquestionably "relates" to ERISA, and is thus preempted by it. *See Clancy v. Emp'rs Health Ins. Co.*, 82 F. Supp. 2d 589, 597 (E.D. La. 1999) (holding that a declaratory judgment claim related to the terms of an ERISA plan must be brought under § 502(a)). Similarly, Omega's Count Four for alleged "breach of contract" centers on allegations that United allegedly breached terms of the ERISA-governed plans by trying to recover overpayments from Omega. (*See* SAC ¶¶ 87–88.) Such a claim clearly "relates to" an ERISA-governed plan and is therefore preempted. *See Poe v. United Ass'n of Journeyman & Apprentices of the Plumbing & Pipefitting Indus. of the United States of Am. AFL-CIO Local 198 Health & Welfare Fund*, 2019 WL 4855158, at *6 (M.D. La. Oct. 1, 2019) (dismissed plaintiffs' breach of contract claim because it "directly involves their right to receive benefits under the ERISA Plan"). And, the Court *has already held* that such a breach of contract claim is preempted in its order dismissing Omega's

---

[30] "[H]owever, the Supreme Court recognizes that, given its broadest reading, the phrase 'relate to' would encompass virtually all state law." *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 382 (5th Cir. 2011) (citing *Egelhoff*, 532 U.S. at 146 and *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995)), *aff'd en banc*, 698 F.3d 229 (5th Cir. 2012). For that reason, courts are to "go beyond the unhelpful text and the frustrating difficulty of defining ['relate to'], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* (quoting *Travelers*, 514 U.S. at 656).

original Complaint.  *See* (ECF 38 at 7) ("[T]he Court agrees that state law claims may only be asserted as to non-ERISA plans governed by Louisiana state law[.]").

> 2.  *Omega's breach of contract claim fails as a matter of law*

Even were it not preempted, Omega's breach of contract claim fails to plausibly allege breach of contract.  Under Louisiana law, a cognizable breach of contract claim would require that Omega show "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Denham Homes, L.L.C. v. Teche Fed. Bank*, 182 So. 3d 108, 119 (La. Ct. App. 2015).[31] Here, Omega fails to identify a single ERISA plan term allegedly breached by United—warranting dismissal.  *See Ledet v. Campo*, 128 So. 3d 1034, 1039 (La. Ct. App. 2013) ("In order to succeed on a breach of contract claim, the plaintiff must prove the existence of the contract, a breach of the *obligations therein*, and damages.") (emphasis added).

In addition, Omega has not plausibly alleged any harm to the obligee, United's insureds. Omega alleges that United's overpayment audits occur "so long after treatment that the out-of-network provider had no ability to obtain payment of the balance owed [from A-patients]." (SAC ¶ 9.)  Omega further alleges that when United recovers overpaid monies from Omega through offsetting, "Omega cannot pursue the B-patient for the balance."  (*Id*. ¶ 13.)  By these allegations, Omega has effectively foreclosed any breach of contract claim by affirmatively alleging that there is no harm to any of United's obligees. *Sanga v. Perdomo*, 167 So. 3d 818, 822

---

[31] A party seeking relief as a third-party beneficiary of a contract still bears the burden to identify the actual contract and allege facts demonstrating a right to relief under that contract.  *See Kerfoot v. FNF Servicing, Inc.*, 2013 WL 5797662, at *7 (M.D. Ga. Oct. 25, 2013); *BioHealth Med. Lab., Inc. v. Cigna Health and Life Ins. Co*., 2016 WL 375012, at *5 (S.D. Fla. Feb. 1, 2016) (Plaintiffs "bear the exclusive burden of establishing the existence of any plan from which their non-ERISA claims arise."), *aff'd in part and vacated in part for other reasons by* 706 F. App'x 521 (11th Cir. 2017).  Omega fails to do both.

23

(La. Ct. App. 2014) ("[P]roof of damages is an essential element to a breach of contract claim."). Nor is Omega harmed because, at bottom, Omega has no entitlement under the plans to obtain benefit payments that were overpaid and thus not due under the plans.

### 3.    Count Three is preempted and implausible

The Court has already held that the language of Omega's assignments (even if valid) does not permit Omega to bring claims seeking prospective relief.  (ECF 90 at 26–27.)  To the extent that Omega seeks to side-step the Second Dismissal Order by bringing a declaratory judgment claim under state law, these arguments fail as § 502(a) "provides the exclusive remedy for enforcing ERISA."  *Clancy*, 82 F. Supp. 2d at 597.

## IV.    OMEGA'S JURY DEMAND SHOULD BE STRICKEN

It is well-settled that there is no right to a jury trial in an ERISA benefits case.  *See Koehler v. Aetna Health Inc.*, 683 F.3d 182, 191 n.19 (5th Cir. 2012) (citation omitted); *Sublett v. Premier Bancorp Self Funded Med. Plan*, 683 F. Supp. 153, 155 (M.D. La. 1988) (striking jury demand in ERISA denial of benefits case); *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994) ("We have held, as have the majority of the other circuits, that ERISA claims do not entitle a plaintiff to a jury trial.").  As such, Omega's jury demand should be stricken from the SAC.

## <u>CONCLUSION</u>

For all of these reasons, the Court should grant United's motion to dismiss Omega's SAC in its entirety and with prejudice.  To the extent that Omega's SAC is not dismissed in its entirety, the Court should strike all allegations related to "A-patients" and the jury demand.

Dated:  April 17, 2020

Respectfully submitted,

*/s/ Errol J. King, Jr.*
Errol J. King, Jr.
PHELPS DUNBAR LLP
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70801
(225) 381-9197

Kevin D. Feder (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

Amanda L. Genovese (*pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
agenovese@omm.com

25

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system, which will send notification of such filing to all counsel of record, including:

Paul A. Lea, Jr.
724 East Boston Street
Covington, Louisiana 70433

Arthur Mahony Murray
Stephen B. Murray
Stephen B. Murray, Jr.
Murray Law Firm
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130

*Attorneys for Plaintiff*
*Omega Hospital, LLC*

*/s/ Errol J. King, Jr.*
Errol J. King, Jr.