# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**OMEGA HOSPITAL, LLC**

**CIVIL ACTION**

**VERSUS**

**NO. 16-560-JWD-EWD**

**UNITED HEALTHCARE SERVICES, INC., ET AL.**

## RULING AND ORDER

This matter comes before the Court on *Defendants' Motion to Dismiss the Second Amended Complaint and to Strike Portions of the Second Amended Complaint* (Doc. 135) (*"Third Motion to Dismiss"*) filed by Defendants United HealthCare Services, Inc. and United Healthcare of Louisiana, Inc. (collectively, "Defendants" or "United"). Plaintiff Omega Hospital, LLC ("Plaintiff" or "Omega") opposes the motion. (Doc. 139.) United has filed a reply. (Doc. 145.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, United's motion is granted in part and denied in part.

# Table of Contents

I.   Relevant Factual and Procedural Background ............................................................... 1

A.   The Second Amended Complaint ................................................................................ 1

1.   Overview of Plaintiff's Allegations .......................................................................... 1

2.   The Alleged Class ....................................................................................................... 4

3.   Plaintiff's Four Counts, Jury Demand, and Prayer ................................................. 5

B.   Procedural History ....................................................................................................... 6

1.   Ruling on the Original Motion to Dismiss .............................................................. 6

2.   Ruling on the Second Motion to Dismiss ................................................................ 7

3.   Ruling on the Motion for Reconsideration ............................................................ 10

4.   Limited Discovery ..................................................................................................... 12

5.   The Instant Motion ................................................................................................... 17

II.   Motion to Strike ............................................................................................................. 18

A.   Parties' Arguments ..................................................................................................... 18

B.   Applicable Law ............................................................................................................ 19

C.   Analysis ........................................................................................................................ 22

III.   Motion to Dismiss for Lack of Standing ...................................................................... 24

A.   Legal Standard ............................................................................................................ 24

B.   Failure to Produce Assignments ............................................................................... 25

1.   Parties' Arguments ................................................................................................... 25

2.   Applicable Law ........................................................................................................... 27

3.   Analysis ....................................................................................................................... 30

C.   Lack of Connection to Dates of Service ................................................................... 33

1.   Parties' Arguments ................................................................................................... 33

2.   Analysis ....................................................................................................................... 35

D.   Anti-Assignment Provisions ...................................................................................... 36

1.   Parties' Arguments ................................................................................................... 36

2.   Anti-Assignment Clauses Generally ....................................................................... 38

3.   SPDs and COCs As Plan Documents ...................................................................... 39

4.   Closing Guidance ...................................................................................................... 42

E.   Claim for Declaratory and Injunctive Relief ........................................................... 44

1.   Parties' Arguments ................................................................................................... 44

2.    Analysis ................................................................................................. 46

IV.    Motion to Dismiss for Failure to State a Claim ............................................. 48

  A.    Legal Standard ........................................................................................... 48

  B.    Count One: Procedural Section 502(a)(1)(B) Claims ................................ 49

    1.    Parties' Arguments ............................................................................... 49

    2.    Applicable Law .................................................................................... 51

    3.    Analysis ................................................................................................. 54

  C.    Claim for Benefits Under Counts One, Two and Four ............................. 56

    1.    Parties' Arguments ............................................................................... 56

    2.    Analysis ................................................................................................. 59

  D.    Breach of Contract Claim .......................................................................... 68

    1.    Parties' Arguments ............................................................................... 68

    2.    Analysis ................................................................................................. 71

V.    Motion to Strike Jury Demand ....................................................................... 75

VI.    Conclusion .................................................................................................... 76

I.      **Relevant Factual and Procedural Background**

A.  **The Second Amended Complaint**

*1. Overview of Plaintiff's Allegations*

This action was brought by Omega against United for alleged violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") and Louisiana state law. (*Second Amended and Restated Class Action Complaint for Declaratory Judgment, Injunctive Relief, and Damages* ("*Second Amended Complaint*"), Doc. 130.)   ERISA "is '[a]n ambitious statutory scheme' that is 'designed "to protect the interests of participants in employee benefit plans and their beneficiaries" by (1) "requiring the disclosure and reporting to participants and beneficiaries"; (2) "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans"; and (3) "providing for appropriate remedies, sanctions, and ready access to the Federal courts." ' " *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 248 (5th Cir. 2019) (quoting *Tolbert v. RBC Capital Mkts. Corp.*, 758 F.3d 619, 621 (5th Cir. 2014) (alteration omitted) (quoting 29 U.S.C. § 1001(b))).

Omega is a hospital and surgical center in Metairie, Louisiana that has furnished healthcare services to members of ERISA health benefit plans insured or administered by United. (*Id.* ¶¶ 1, 19.)  Omega is an out-of-network provider, which means it does not have a contract with United to furnish medical services to individuals covered by United Group Health Plans at negotiated rates. (*Id.* ¶¶ 3–4.)

Plaintiff alleges (though United disputes) that, when Omega provides medical care to United plan participants, these participants assign to Omega the benefits available under their employer health benefit plans. (*Id.* ¶ 4.)  According to the *Second Amended Complaint*, out-of-network providers like Omega then bill United for the medical services furnished to the patients

covered by a United plan, and United pays the provider any benefits due under the patient's applicable plan. (*Id.*)  In this case, Omega claims to have "derivative standing" to sue on behalf of the plan participants who assigned it claims.

As will be explored below, some of the plan documents contain "anti-assignment" provisions. (*Sec. Amend. Compl.* ¶ 22, Doc. 130.)  Omega alleges that (1) these provisions are illegal, and (2) United waived and/or is estopped from asserting its right under the anti-assignment provisions (a) by reimbursing Omega pursuant to the assignments, thereby indicating that it assented to the assignments; (b) by acting on the assignments by paying patient claims; and (c) by Omega's reasonable reliance on United's conduct in conducting its business. (*Id.* ¶ 23.)[1]

Plaintiff further alleges that, in 2007, United adopted a policy of conducting "post hoc audits of bills for out-of-network providers that it previously paid, often years earlier."  (*Sec. Amend. Compl.* ¶ 7, Doc. 130.)  According to the *Second Amended Complaint,* United claimed its audits discovered that overpayments had been made, so United would engage in "an unlawful form of self-help" by offsetting "totally unrelated funds: fees due to the providers on different patients, usually covered by different employer plans, for whom fees for medical services provided by the out-of-network provider were due." (*Id.* ¶¶ 7–8.)  The post-hoc audits purportedly determined that parts of the out-of-network charges represented services not covered under the member's plan, and the effect "was to leave the patient-member with a more substantial payment responsibility for the out-of-network provider's bill." (*Id.* ¶ 9.)  Typically, "United made this determination so long after treatment that the out-of-network provider had no ability to obtain payment of the balance owed." (*Id.*)

At the heart of the *Second Amended Complaint*, Plaintiff alleges:

---

[1] The *Second Amended Complaint* contains two paragraph 23s.  This refers to the first.

> United would recoup alleged overpayments not by seeking to recover those funds from the originally treated United Group Health Plan member (hereinafter, the "A-patient"), but by unilaterally underpaying amounts due to Omega and out-of-network providers for more recently treated United Group Health Plan members, often covered by entirely different employer plans (hereinafter, the "B-patient").

(*Sec. Amend. Compl.* ¶ 10, Doc. 130.)   Omega claims that this offsetting (1) deprived it and other such providers of a meaningful explanation as to why the original A-patient bills were "overpaid" and (2) "resulted in serious financial harm to Omega and out-of-network providers, by effectively, depriving them of the ability to recover the balance between the charges incurred and the reimbursement paid by United." (*Id.* ¶¶ 11–12.)   Plaintiff further explains in the operative complaint:

> In the normal course of events, when United has reimbursed less than the full incurred bills from the provider, the provider bills the balance to the patient. United's unlawful self-help scheme deprives the provider of the ability to do so. Since United deducts the allegedly overpaid amounts from benefits payable for B-patient bills, rather than from the A-patient whose benefits were purportedly overpaid, out-of-network providers like Omega are left with no viable means of pursuing the unpaid portion of either bill. Omega cannot pursue the B-patient for the balance, because it was not the B-patient whose bill was purportedly overpaid. Requiring the B-patient to pay the balance due because of an alleged overpayment to a different patient, covered by a different plan, would be patently unfair, if not unlawful. Omega cannot pursue the A-patient, because: 1) Omega has been provided no information as to why the bill was purportedly overpaid, much less what portion of the bill was overpaid; and 2) any claim that Omega might have against the A-patient is usually time-barred under the terms of the United Group Health Plan or applicable law.

(*Id.* ¶ 13.)

United calls this recoupment procedure "cross-plan offsetting," but Omega declares it is "unlawful self-help to funds due and owing to out-of-network providers." (*Sec. Amend. Compl.* ¶ 14, Doc. 130.)   Plaintiff claims ERISA and the plan bars recoupment from Patient A and "cross-plan offsetting of recouped funds to satisfy United's obligation to Patient B." (*Id.*)   According to the *Second Amended Complaint*:

3

United's unlawful self-help practice of recouping prior payments from Patient A's account and applying those recoupments to pay Patient B's account leaves providers like Omega and the putative class members with no means of collecting the benefit payments owed to them under the United Group Health Plans. . . . [T]his practice is not only unfair but also unlawful. United cannot cure its accounting errors on one group of patients by withholding funds due on the bills of other patients.

(*Id.* ¶ 15.) Omega further claims:

United violated ERISA by making adverse benefit determinations and pursing recoupment and cross-plan offsetting without complying with ERISA's substantive and procedural requirements, including notice, hearing, and tracing of assets mandated by *Montanile v. Bd. of Trustees of the Nat'l Elevator Indus. Health Benefit Plan*, [577 U.S. 136, 136 S. Ct. 651, 193 L. Ed. 2d 556 (2016),] and its related cases.

(*Id.* ¶ 18.) Omega also details the more specific ways United violated ERISA and the plan:

(a) by failing to fully disclose the reimbursement rules used to reduce members' benefits and/or failing to adhere to the rules and policies that were disclosed in situations involving cross-plan offsetting; (b) by making retroactive benefit claim denials without proper disclosure or following plan or ERISA mandated procedures; (c) by breaching the plan terms by authorizing, administering, or otherwise making cross-plan recoupments; (d) by seeking to impose new and previously undisclosed policies after-the-fact to compel repayments by Omega and/or the Class members for alleged overpayments ; (e) by improperly offsetting benefits that were correctly paid to Omega and to the Class members; (f) by offsetting previously paid amounts deposited in the general operating accounts of Omega and the Class members without tracing the overpaid funds to their source; and (g) by failing to fulfill the obligations of good faith, due care and loyalty. 29 U.S. C. ¶ 1106(b)(1) and (2).

(*Id.* ¶ 50.)

### *2. The Alleged Class*

Omega brings this case on behalf of itself and the following class:

All healthcare providers in the State of Louisiana who, from ten (10) years prior to the filing date of this action to its final termination ("the Class Period"), provided or will provide out-of-network healthcare services or supplies to patients covered under healthcare plans governed by ERISA and insured or administered by United, and who, after receiving reimbursement pursuant to an assignment from a United

plan member, were subjected either to United's unilateral recovery of all or a part of such payment by cross-plan offset or offset against other funds belonging or owed to the healthcare provider.

(*Id.* ¶ 51.)

### 3. Plaintiff's Four Counts, Jury Demand, and Prayer

The *Second Amended Complaint* contains four counts. Under Count One, Omega makes a claim for benefits under ERISA plans. (*Sec. Amend. Compl.* ¶¶ 62–75, Doc. 130.)  Plaintiff claims that the cross-plan offsetting constitutes adverse benefit determinations under ERISA. (*Id.* ¶ 64.) Under ERISA, adverse benefit determinations require certain notice, a reasonable opportunity to appeal, and the right to full and fair review of the claim. (*Id.* ¶¶ 65–66.)  Omega asserts that United's cross-plan offsetting fails to satisfy these ERISA requirements. (*See id.* ¶¶ 67–69.) Further, United's recoupment procedure "exceeds the permissible range of remedies accorded United in that United's self-help actions do not constitute authorized equitable relief under *Montanile* and related decisions of the United States Supreme Court." (*Id.* ¶ 70.)  Plaintiff seeks return of the benefit amounts pursuant to the A-patient assignments under 29 U.S.C. § 1132(a)(1)(B). (*Id.* ¶ 71.)  Omega also claims that United's cross-plan offsetting constitutes "an unlawful conflict of interest under ERISA, particularly, but not exclusively, in those circumstances where United administers both fully insured and self-insured plans." (*Id.* ¶ 74.)

Count Two is entitled "Denial of Benefits due to Misinterpreting Plan Terms." (*Sec. Amend. Compl.* ¶¶ 76–82, Doc. 130.)  Omega claims that United's "offsetting of previously paid benefits against reimbursements owed to Omega and to the Class members for unrelated services are not authorized by the operative plan terms, and represent improper self-help in violation of both the plan terms and ERISA procedural guidelines." (*Id.* ¶ 79.)  According to Plaintiff, restitution is only allowed by United "where the assets to be recovered are easily identified and

separated from other assets, and cross-plan offsetting is not an available form of self-help where, as here, the assets have been deposited into the healthcare provider's general operating fund." (*Id.*) Omega avers that it and the class members are entitled to retain those amounts recouped by cross-plan offsetting and to be refunded those amounts and that United should be estopped and enjoined from further self-help without complying with ERISA. (*Id.* ¶ 82.)

Count Three is for declaratory and injunctive relief. (*Id.* ¶ 83–85.)  Omega seeks (1) a declaration that United violated ERISA; (2) a declaration that United's actions violate the plan terms; and (3) an injunction prohibiting United from prospectively pursuing cross-plan offsetting. (*Id.* ¶ 85.)

Count Four is a state law breach of contract claim. (*Sec. Amend. Compl.* ¶¶ 86–91, Doc. 130.)  These allegations will be more fully explored below.  In short, Omega alleges, "By improperly and unlawfully retaining and continuing to retain, offsetting and continuing to offset reimbursements previously paid to Omega and to the Class members, United has breached the plan contract between United and the plan beneficiaries (and their healthcare providers where acting pursuant to a valid assignment)." (*Id.* ¶ 90.)

Omega closes by making a jury demand. (*Id.* ¶ 92.) Omega also prays for declaratory and injunctive relief and for damages. (*Id.* at 40–42.)

### B.  Procedural History

#### 1. Ruling on the Original Motion to Dismiss

In response to the original *Complaint*, United filed a *Motion to Dismiss* (Doc. 11) (the "*Original Motion to Dismiss*").  After considering the briefs and the arguments made during oral argument, Judge Brady[2] granted in part and denied in part United's motion. (Doc. 38.)  In

---

[2] This case was originally assigned to Judge Dick, but she recused herself following the oral argument on this motion. (Doc. 37.)

particular, the Court denied United's motion on the issue of standing, finding instead that Omega had satisfied Article III standing for purposes of a motion to dismiss. (*Id.* at 4.)  The Court granted United's motion as to the lack of plausibility of Omega's ERISA claims, but gave Omega thirty (30) days to file an amended complaint to "allege with specificity the dates of service and claim numbers at issue with respect to the identified patients." (*Id.* at 7.)  The Court also granted United's motion finding that all of the state law claims brought on behalf of ERISA plan participants were preempted by ERISA, so these claims were dismissed with prejudice. (*Id.* at 9.)  With respect to the state law claims asserted against the non-ERISA plan participants under Louisiana's "prompt payment statute" and Louisiana's recoupment laws, the Court dismissed them without prejudice subject to Omega's right to amend these allegations in order to plead these claims with greater particularity. (*Id.* at 7–8.)  Finding that Omega's remaining state law claim of negligent misrepresentation satisfied Rule 9 of the Federal Rules of Civil Procedure, the Court denied United's motion as to this claim in regards to the non-ERISA plan participants. (*Id.* at 8–9.)

### 2. Ruling on the Second Motion to Dismiss

Following the Court's ruling, on October 20, 2017, Omega filed its *First Amended and Restated Class Action Complaint* ("*First Amended Complaint*") (Doc. 41). Following Judge Brady's passing, this case was reassigned to the undersigned. (Doc. 62.)

In response to the *First Amended Complaint*, United filed its second *Motion to Dismiss* (Doc. 67) ("*Second Motion to Dismiss*").  United sought dismissal based on the following grounds: (1) Omega lacked standing to bring this case; (2) Omega failed to exhaust administrative remedies; (3) Omega failed to state plausible ERISA claims; (4) the Court lacked supplemental jurisdiction over Omega's state law claims; and (5) alternatively, Omega's state law claims were implausible and the breach of contract claim was preempted by ERISA. (Doc. 67-1.)

On September 11, 2018, this Court granted in part and denied in part United's motion. The Court first held that Louisiana's assignment statute, La. R.S. § 40:2010, invalided the anti-assignment provisions in the Summary Plan Description ("SPD") and Certificate of Coverage ("COC") because of *Louisiana Health Services & Indemnity Co. v. Rapides Healthcare System*, 461 F.3d 529 (5th Cir. 2006). (Doc. 90 at 11–14.) The Court also relied on the district court's opinion in *Dialysis Newco Inc. v. Community Health Systems Trust Health Plan*, No. 15-272, 2017 WL 2591806 (S.D. Tex. June 14, 2017) in finding that La. R.S. § 40:2010 was not preempted.[3] (*Id.* at 14–18.) Undersigned also rejected United's argument that Omega could not simultaneously serve as an assignee of a plan member's rights and as an authorized representative of those same rights. (*Id.* at 18–20.) However, the Court found that Omega lacked standing to pursue any ERISA claims on patient LL's behalf, so those claims were dismissed without prejudice. (*Id.* at 20–22.)

Important here, the Court also addressed whether Plaintiff had a Section 502(a)(3)(A) breach of fiduciary claim for prospective equitable relief. (Doc. 90 at 22.) Omega had sought declaratory and injunctive relief to prohibit United from recovering future or prospective overpayments in a way that would violate the patients' plans. (*Id.*) Undersigned relied in part on *Premier Health Center, P.C. v. UnitedHealth Group*, 292 F.R.D. 204 (N.J.D.C. 2013) and held that the assignments at issue did not encompass prospective claims for injunctive relief, as the assignment qualified the assignment of rights to those for past services rendered by Omega. (*Id.* at 22–25.) The Court also explained how, under Fifth Circuit law, a health care provider could obtain derivative standing to assert fiduciary duty and non-benefit ERISA claims only if the assignment specifically referred to such claims. (*Id.* at 25 (citations omitted).) That is, "only an express and

---

[3] After this Court issued its opinion, *Dialysis Newco Inc.* was overruled by the Fifth Circuit. *See Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246 (5th Cir. 2019). The Court will explore this issue in greater detail *infra*.

knowing assignment of an ERISA fiduciary claim is valid." (*Id.* at 26 (quoting *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Ent. Co.*, 105 F.3d 210, 218 (5th Cir. 1997)).) Consequently, because "there is no express reference to fiduciary duty claims, or the assignment of future rights for that matter, in Omega's assignments[,] . . . all of Omega's breach of fiduciary claims . . . fail[ed] for lack of standing." (*Id.* (citation omitted).) Thus, the Section 502(a)(3)(A) breach of fiduciary duty claim seeking prospective relief and the Section 502(a)(3)(B) breach of fiduciary duty claim seeking unjust enrichment due to United's failure to comply with the terms of the plan were dismissed for lack of derivative standing. (*Id.* at 27.)

United also claimed that Omega failed to exhaust its administrative remedies. But, the Court rejected this argument and found that Omega was denied meaningful access to administrative remedies. (Doc. 90 at 27–30.)

The Court also dismissed Plaintiff's claim for benefits under Section 502(a)(1)(B). (*Id.* at 30–33.) While Omega was not required to cite to the specific terms of the plan (*id.* at 30–32), "Omega ha[d] failed to allege that United directly recouped any overpayments from the ERISA plans of SJ or LL as a result of the unilateral post-payment audits" (*id.* at 32). Critical to the Court's ruling (and critical to part of this one), Plaintiff had alleged that "the overpayments pertaining to these three Plans"—SJ's Plan, LL's Plan, and DB's Plan—"were recouped by 'reducing payment for services rendered by Omega to **unrelated patient accounts**, none of which patient accounts and services were recovered under the same United Group plan' as SJ, LL, or DB." (*Id.*) "More simply put, Omega has alleged that the Plans of other, unrelated patients, executed offsets to Omega, that allowed United to recover for the overpayments made to Omega on behalf of SJ, LL, and DB." (*Id.*) This Court held:

> While such allegations may create the inference that "unrelated patients" are entitled to those benefits recouped through cross-plan offsetting, they fail to state a

plausible claim that the patients on whose behalf Omega brings this lawsuit—SJ and LL—are entitled to such benefits under ERISA.

Moreover, as correctly argued by United, in order for Omega to challenge the legality of the cross-plan offsets, it must sue using the rights of patients who are participants in the Plans that executed the offsets.  Based upon the well-plead allegations of the *First Amended Complaint*, however, it is clear that Omega has failed to do so.

For the foregoing reasons, the Court finds that Omega and ERISA Plan class representative SJ has failed to allege a plausible claim for benefits under ERISA. Accordingly, Omega's 29 U.S.C. § 1132(a)(1)(B) claim must be dismissed.

(*Id.* at 32–33.)

The other claims were disposed of as well.  The Court dismissed Plaintiff's claim that it was deprived a full and fair review of denied claims as required by Section 503 (29 U.S.C. § 1133) and the relevant regulations. (Doc. 90 at 33–36.) The Court found that United is the "Plan Administrator," and such a claim can only be brought by the "Plan." (Doc. 90 at 35–36.)  Lastly, the Court declined to exercise supplemental jurisdiction over the state law breach of contract and negligent misrepresentation claims. (Doc. 90 at 36.)

### 3. Ruling on the Motion for Reconsideration

On October 9, 2018, Omega filed a *Motion for Reconsideration and for Leave of Court to Amend* (Doc. 92) ("*Motion for Reconsideration*").  Plaintiff argued that (1) Omega inartfully plead the activity engaged in by United and the injury cased by United's "recoupment scheme"; (2) the Court accepted United's version of events which was contrary to Omega's contentions; (3) the decision of *Montanile* vindicates Omega's theory of recovery; and (4) the Court legally erred regarding the express assignment of the claim for breach of fiduciary duty. (Doc. 92-1 at 2.) Omega further contended that its prior amendment was in response to Judge Brady's ruling on the *Original Motion to Dismiss*, and that ruling did not address Omega's legal theory or order Omega to name assignments from patients whose accounts were used as the vehicles for United to recover

10

the overpayments. (*Id.*)  Thus, Omega did not make such amendments.  Omega sought leave to cure the deficiencies identified by the Court in response to its ruling on the *Second Motion to Dismiss*. (*Id.*)

On April 30, 2019, this Court issued a *Ruling* denying the motion for reconsideration but granting the motion for leave to amend. (Doc. 103.)  Undersigned held that Omega had failed to establish any of the grounds for granting a motion for reconsideration. (*Id.* at 20.)  However, the Court found that, because Omega could produce an assignment for patient LL, Omega's proposed amendment was not frivolous. (*Id.* at 21–22.)

The Court also found that "it may have prematurely disposed of Omega's case based on an undeveloped record that would have benefited from some limited discovery and a more artfully plead complaint of a very complicated scenario." (*Id.* at 24.)  The Court relied on *Peterson v. UnitedHealth Group, Inc.*, No. 14-2101, 2019 WL 1578750 (D. Minn. Apr. 12, 2019), which involved similar "cross-plan offsetting."  (*Id.* at 25.)  That too was a complicated ERISA case, and the Court there allowed discovery to allow the "parties and the court" and opportunity "to identify the Plan A groups and the Plan B groups as well as the language of those plans and whether the cross-plan offsetting was authorized or not." (*Id.* at 26 (citing *Peterson v. UnitedHealth Group Inc.*, 242 F. Supp. 3d 834 (D. Minn. 2017)).)

This Court also considered *Montanile* and *Manuel v. Turner Industries Group, LLC*, 905 F.3d 859 (5th Cir. 2018)  and found that an amendment would not be futile. (*Id.* at 27.)[4]  Further, there was no showing of undue delay, bad faith, or dilatory motive so as to preclude an amendment under Rule 15(a). (*Id.* at 28.)

---

[4] The Court noted that Omega argued *Manuel* in its reply memorandum, so United had no opportunity to specifically address the decision before the Court rendered its ruling. (Doc. 103 at 15.)  This is important given the Court's current view of *Manuel*, explored *infra*.

In closing, the Court allowed leave to amend but reminded Omega of its Rule 11 obligations, saying that "Omega should be thoughtful of not only the good faith grounds of its amendment, but also judicial economy" and that Omega should admit if it cannot state a claim and "avoid a waste of judicial resources." (*Id.* at 29.)  The Court also advised that it would issue a separate order setting a date and time for a pre-amendment status conference "to discuss the scope of limited discovery, the identification [of] all plans and plan participants implicated, and a timeframe for limited discovery and amendment of the complaint." (*Id.* at 29–30.)

### *4. Limited Discovery*

On June 4, 2019, the Magistrate Judge held a status conference on the limited discovery. (Doc. 108.)  After she rejected Omega's request for broad discovery, Omega was given until June 10, 2019, to supplement the list of about sixty (60) individuals listed on its Exhibit 1 to the discovery requests it propounded to provide the following information for each, to the extent it was not already provided: patient name, patient date of birth, patient social security number, United member number and group number, dates of service, and United claim number. (*Id.* at 2.) Additionally, by August 1, 2019, Omega had to "produce assignments for the approximately sixty (60) individuals listed on Exhibit 1 to the discovery requests propounded by Omega." (*Id.*)

United was also required to make certain disclosures.  By August 1, 2019, United had to produce all plan documents related to the approximately sixty (60) individuals listed on Exhibit 1 to the above discovery requests and identify whether each plan was fully insured or self-funded. (*Id.*)  United also had to produce all plans for patients SJ, LL, and DB listed in the *First Amended Complaint* or certify that they previously produced everything in their care/custody/control. (*Id.*) By August 15, 2019, United had to "provide to Omega citations to all plan provisions upon which United relies for the proposition that the plans authorize cross-plan offsetting." (*Id.*)

On June 10, 2019, Omega produced a claims spreadsheet detailing 197 claimed dates of service. (Genovese Decl. ¶ 5, Doc. 135-3.) The June 10, 2019, spreadsheet contained patients marked "A" and "B," though, according to United, most of the A-patient information was incomplete. (*Id.*)

On July 31, 2019, United produced alleged plan documents related to the B-patients on the June 10, 2019, spreadsheet for whom Omega had provided complete information. (*Id.* ¶ 6.) United represented to Omega at the time that certain information on the spreadsheet was missing and that it would need additional time to produce documents once corrected information was provided. (*Id.*; Ex. B, Doc. 135-5.)

On July 31, 2019, Omega produced two PDF files each containing scanned documents purporting to be assignment of benefit forms. (Genovese Decl. ¶ 13, Doc. 135-3.) The documents Omega produced relate to patient/members who comprise 47 claim lines on the claims spreadsheet. (*Id.* ¶ 14.) These documents are included in United's submissions as Ex. H, Doc. 135-11.[5]

On August 16, 2019, a telephone conference was held to discuss the extension of deadlines. (Doc. 113.) Plaintiff's counsel also advised the Court that he intended to pursue limited discovery with regard to Plan A and Plan B individuals. (*Id.* at 1.) United objected, arguing that the Court precluded amendment to attempt to re-allege claims as to Plan A individuals. (*Id.*) The Magistrate

---

[5] United makes several complaints about this production, arguing that (1) some of the forms were in fact "payment agreements" and not assignments; (2) on several occasions, only a single assignment of benefits form was produced despite multiple dates of service, sometimes years apart; and (3) "[o]nly 25 dates of service listed on the Claims Spreadsheets aligned with the dates on assignment produced by Omega." (Genovese Decl. ¶ 15, Doc. 135-3.) These alleged problems will be addressed more extensively below. Suffice it to say at this point, on October 29, 2019, counsel for United sent an email to counsel for Omega saying that the Court's orders (Docs. 108, 113) required Omega to produce assignments for all individuals for whom they seek plan information by October 23, 2019. (Ex. J, Doc. 135-13 at 2–3.) United sought confirmation that there were no more remaining/missing assignments in Omega's possession. (*Id.* at 3.) On November 5, 2019, counsel for United emailed again saying, "Having received no response, we are proceeding on the assumption that no assignment forms other than the ones produced to date are in Omega[']s possession. [] Should Omega attempt to produce additional assignments in the future, we will move to preclude or strike them." (*Id.* at 2.) On the same day, counsel for Omega responded, "You may presume all you wish but see[ing] as actual discovery has yet to begin . . .you are likely incorrect." (*Id.*)

Judge found that, while the ruling "express[ed] skepticism as to Plaintiff's ability to state a claim as to Plan A participants, the Ruling does not foreclose the ability to amend to assert such a claim based on [her] reading." (*Id.* at 1–2.)  The Magistrate Judge explained that the ruling implicitly rejected the notion that amendment would be futile and then went on to advise Omega of its Rule 11 obligations. (*Id.* at 2.)  The Court then extended the above deadlines, the last of which would fall on November 25, 2019.

On August 23, 2019, Omega produced an updated claims spreadsheet (the "Claims Spreadsheet") containing names and information for 81 B-patients and 121 dates of service. (Genovese Decl. ¶ 7, Doc. 135-3.)  This documented included no reference to A-patients identified in Omega's initial spreadsheet or to any new A-patients. (*Id.*; *see also* Ex. C, Doc. 135-6.)

On August 26, 2019, counsel for United emailed counsel for Omega asking for confirmation that the spreadsheet sent to them on August 23, 2019, was "to constitute the final and only list of claim-identifying information that United is to utilize as it undertakes the effort to locate and produce any additional plan documents." (Genovese Decl. ¶ 8, Doc. 135-3; Ex. D, Doc. 135-7 at 2–3.)  Counsel for Omega confirmed that, "For purpose[s] of discovery prior to the amendment only, this is the current and most updated list so far but it does not mean your records and our records will not unearth further claims in both the A and B categories." (Ex. D, Doc. 135-7 at 2.)  The next day, counsel for United responded that, while it would oppose efforts to add more claims in the future, "for present purposes, the current/updated spreadsheet [Omega] sent on August 23 is the one that we should work from." (*Id.*)

Pursuant to the August 16, 2019, order (Doc. 113), on October 23, 2019, United produced what it purports to be as claim documents for the claims identified on the Claims Spreadsheet. (Genovese Decl. ¶ 9, Doc. 135-3; Ex. E, Doc. 135-8 at 2.)  Gretchen Hess, a Legal Services

14

Specialist for United, attests that an investigation was done to enable United to identify and retrieve the plan documents from Documentum and PRIME Tracking Automation, the primary databases for storing plan documents. (Hess Decl. ¶¶ 2, 5, Doc. 135-2.)  Hess further said that the plan documents were received from these databases from the earliest date of service identified on the Claims Spreadsheet. (*Id.* ¶ 6.)  Hess stated that the plan documents produced to United's outside counsel were "true and correct copies and included Summary Plan Descriptions and Certificates of Coverage containing the terms and coverage of the member's health benefits plan pursuant to 29 CFR § 2520.102-3." (*Id.* ¶ 7.)[6]  Additionally, counsel for United stated in the cover letter for the production that it "includes plan documents that United was able to identify, to date, based on the information contained in the claim-identifying spreadsheet produced by Plaintiff on August 23, 2019." (Ex. E, Doc. 135-8 at 2.)  Counsel for United qualified, "If additional plan documents are discovered, United will supplement this production." (*Id.*)

On November 25, 2019, as required by the Court's order (Doc. 113), United produced a chart identifying terms in the produced "plan documents" that purport to authorize and confer United with the right to recover overpayments by cross-plan offsetting. (Genovese Decl. ¶ 10, Doc. 135-3.)  Counsel for United stated:

> The plan documents covered by this disclosure chart are those that United was able to identify, to date, from the claim-identifying spreadsheet produced by Plaintiff on August 23, 2019.  United will supplement this disclosure if additional provisions or plan documents are discovered.  United also gives notice that it intends to rely upon other provisions and terms in the controlling plan documents not specifically listed herein, including anti-assignment provisions.

(Ex. F, Doc. 135-9 at 2.)

---

[6] As will be explained below, there is a dispute as to whether these Summary Plan Descriptions and Certificates of Coverage are in fact plan documents.

15

On December 5, 2019, counsel for Omega emailed a letter to counsel for United that said, "The chart provided [of relevant plan terms] identifies 'B-Patients' from whose reimbursements for services offsets were taken.  As I read the chart, I understand that the plan language cited is from the plan document(s) for Plan(s) covering the referenced B-Patient.  Please confirm that this understanding is correct." (Ex. L, Doc. 135-15 at 2.)  Omega's attorney further stated that the Bates-Numbered Plan documents were not provided with the chart and were not produced in litigation. (*Id.*)  Omega also said, "In order for us to review the language in its proper context, we will require complete copies of each cited Plan Document.  Please provide the identified Bates-Numbered documents." (*Id.*)

On December 6, 2019, counsel for United responded to an email from counsel for Omega by detailing its production efforts. (Genovese Decl. ¶ 11, Doc. 135-3; Ex. G, Doc. 135-10.)  In the letter, United's counsel stated:

> To be clear, your co-counsel, Mr. Lea, confirmed via email on August 26, 2019 that Plaintiff's August 23, 2019 claim-identifying spreadsheet is the current complete list of claims for which information is sought. . . . United therefore produced plan documents and disclosure information that United was able to identify, to date, based on the  information contained in Plaintiff's August 23, 2019 claim-identifying spreadsheet.

(Ex. G, Doc. 135-10 at 2.)  United also states that it "previously produced to Plaintiff the Bates-stamped plan documents listed in United's November 25, 2019 disclosure chart via secured FTP by the deadlines identified in the Order." (*Id.*)

United represents that "Omega never responded to the statements in the cover letters and/or the December 6, 2019, letter discussed above[.]" (Genovese Decl. ¶ 12, Doc. 135-3.)  United also represents that "[n]either Omega nor its counsel discussed or raised any issues regarding United's productions of plan documents prior to filing the SAC," (*id.*) though the December 5, 2019, letter from Omega seems to contradict this, (Ex. L, Doc 135-15 at 2).

16

On December 16, 2019, the Magistrate Judge conducted a follow-up conference. (Doc. 119.)  The limited discovery was discussed. (*Id.* at 1.)  The Magistrate Judge rejected Plaintiff's request for a corporate deposition of defendants and found that limited discovery was complete. (*Id.*)  Plaintiff was given until February 17, 2020, in which to amend the complaint. (*Id.*)

### 5. The Instant Motion

Following a few extensions (Docs. 127, 129), Plaintiff filed the *Second Amended Complaint* on March 9, 2020 (Doc. 130).

On April 17, 2020, United filed the instant *Third Motion to Dismiss*. (Doc. 135.)  First, United argues that all allegations related to A-Patients should be stricken from the record as immaterial.

Second, pursuant to Rule 12(b)(1), United urges that Omega lacks standing to bring claims as an assignee because (a) Omega has failed to produce assignments for most of the claims at issue; (b) many of Omega's alleged assignments lack the requisite connection to the dates of service to be service to be facially valid; (c) some purported assignments are void due to the anti-assignment provision; and (d) even if the assignments were valid, Omega cannot bring a claim for forward-looking relief under Count Three.

Third, under Rule 12(b)(6), United asserts that Omega fails to state a viable claim because (a) Count One's claim for procedural violations of ERISA suffers from fatal pleading defects; (b) Plaintiff's claim for benefits in Counts One, Two, and Four fails because Omega has not adequately alleged an ERISA violation; and (c) Omega's state law claims (Count Three for declaratory and injunctive relief and Count Four for breach of contract) fail because (i) they are preempted; and (ii) they are implausible as a matter of law.

And fourth, United moves to strike Plaintiff's demand for a jury trial.

17

## II.   Motion to Strike

### A.  Parties' Arguments

United argues that Omega failed to identify any A-patients in the Claims Spreadsheet. Further, United asserts that "Omega confirmed on at least five occasions that no A-patients are in this case" and that the "Court has already held that such patients do not have plausible ERISA-claims." (Doc. 135-1 at 19.)  Thus, allegations related to A-patients are immaterial and should be stricken.   At the same time, United asserts: "Because each of Omega's causes of action are premised on allegations related to A-patients, Omega's [*Second Amended Complaint*] must be dismissed." (*Id.*)

Omega responds by emphasizing the standard for motions to strike—such motions are disfavored and are only warranted when the mover shows prejudice and that the allegations at issue have "no possible relation to the controversy." (Doc. 139 at 8–9 (citations omitted).)  Omega maintains:

> [Omega seeks to] assert a benefits claim under *Montanile/Manuel* on behalf of the A-patients, testing whether a health insurer may exercise unilateral self-help by offsetting previously paid benefits against amounts owed for claims under different health plans, after those amounts were deposited in the provider's general funds and disbursed, rather than tracing and recovering the alleged overpaid benefits.

(*Id.* at 9.)  The Court has yet to rule on the viability of those claims.  Further, "the A-patient claims are intertwined with the B-patient claims – the other side of the same coin." (*Id.*)  Thus, according to Omega, inclusion of the A-patient claims "serves a legitimate purpose." (*Id.*)  Finally, the Magistrate Judge gave United an opportunity to brief why it thought the A-patient claims were no longer viable, and United filed nothing.  Thus, United cannot meet its burden for a motion to strike.

United replies that "A-patient claims [] are plainly irrelevant and not viable." (Doc. 145 at 7.)  The Court previously held that, "for Omega to challenge the legality of the cross-plan offsets,

18

it must sue using the rights of patients who are participants in the Plans that executed the offsets." (Doc. 145 at 7 (citing Doc. 90 at 33 n.135).)  Plaintiff failed to state viable claims for A-patients. Additionally, Plaintiff listed no A-patient claims on the operative "Claims Spreadsheet." (Doc. 135-6.)  This "flouts Magistrate Judge Wilder-Doomes' limited discovery order requiring Omega to produce a list of 'all Plan A and Plan B participants about whom Omega seeks plan information' ([Doc.] 113 at 2), which implemented this Court's directive to 'identif[y] all [] plan participants implicated' by this litigation. (Doc. 103 at 29.)" (Doc. 145 at 7.)  Additionally, A-patients and B-patients would be fighting over the same dollar amounts, so there is an irreconcilable conflict that would bar Omega from asserting both. (*Id.* at 8.)  Lastly, with respect to prejudice, Rule 12(f) is disjunctive, so United need only show immateriality *or* prejudice.  And, even if United did have to show prejudice, United clearly has suffered it from having to expend resources defending against claims that have prompted two successful motions to dismiss. (*Id.*)

### B.  Applicable Law

Federal Rule of Civil Procedure 12(f) provides in relevant part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. 2020). *See also United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012) (The Fifth Circuit "review[s] a district court's ruling on a motion to strike for abuse of discretion.").

A party urging a motion to strike must meet certain requirements.  "[M]otion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy[.]" *Coney*, 689 F.3d at 379 (quoting *Augustus v. Bd. of Pub. Instruction of Escambia*

*Cnty., Fla.,* 306 F.2d 862, 868 (5th Cir. 1962)); *see also Gilchrist v. Schlumberger Tech. Corp.*, 321 F.R.D. 300, 302 (W.D. Tex. 2017) (citing *Coney*, 689 F.3d at 379).  Further, the mover must show that the "presence [of the challenged allegations] in the pleading throughout the proceeding will be prejudicial[.]" *F.D.I.C. v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993) (citing *Augustus*, 306 F.2d at 868); *see also Global Adr*,  2003 WL 21146696, at *1 (citing *Niblo*, 821 F. Supp. at 449); Wright & Miller, *supra*, at § 1382 ("Thus, it is not surprising that a motion to strike frequently has been denied when the court believes that no prejudice could result from the challenged allegations, even though the offending matter literally is within one or more of the categories set forth in Rule 12(f). This has been true, for example, if the pleadings will be withheld from the jury or if the jury is carefully instructed as to the weight to be given the pleadings.").  As Wright and Miller states:

> [T]here appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy *and* may cause some form of significant prejudice to one or more of the parties to the action.

Wright & Miller, *supra*, at § 1382 (emphasis added); *see also Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868); *Global Adr*, 2003 WL 21146696, at *1 (citing *Niblo*, 821 F. Supp. at 449). *But see Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 852 (E.D. La. 2011), *on reconsideration in part*, No. 11-871, 2012 WL 1230736 (E.D. La. Apr. 12, 2012) ("A motion to strike should be granted only when 'the allegations are prejudicial to the defendant or immaterial to the lawsuit.'" (quoting *Harris v. USA Ins. Companies*, No. 11-201, 2011 WL 3841869, at *1 (E.D. La. Aug. 30, 2011) (quoting *Johnson v. Harvey*, No. 96-3438, 1998 WL 596745, at *7 (E.D. La. 1998))).  This standard is a "heavy burden," *Gilchrist*, 321 F.R.D. at 302, and a "high bar," *Global Adr*, 2003 WL 21146696, at *1.

Looking at the specific grounds for striking, " '[i]mmaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material." Wright & Miller, *supra*, at § 1382. "Unnecessary jurisdictional allegations may be eliminated as immaterial as may averments of evidentiary facts" *Id.* "In addition, superfluous historical allegations also have been subject to a motion to strike, although allegations of this type may be permitted in a pleading if they are relevant to the claim for relief or provide useful background for the parties and the court in the absence of any prejudice." *Id.*

With respect to the procedural aspects of motions to strike, "[a] motion to strike must comply with the requirement in Rule 7(b) that motions state with particularity the grounds therefor and set forth the nature of relief or type of order sought." *Id.* at § 1380. "All well-pleaded facts are taken as admitted on a motion to strike but conclusions of law or conclusions drawn from the facts do not have to be treated in that fashion by the district judge." *Id.* "The district court also should refrain from becoming enmeshed in the merits of the action or the legal sufficiency of the pleadings, although this may be difficult to prevent when the relevance or materiality of the challenged allegations is in issue on the motion." *Id.* at § 1382. "If the court grants a motion to strike redundant, immaterial, impertinent, or scandalous material, its order should delineate the matter to be eliminated with some care so as to avoid the excision of unobjectionable allegations and to prevent unnecessary controversy over the scope of the order." *Id.* Thus, "[i]f the district court determines that certain references in a pleading are prejudicial, only those references and not the entire paragraphs containing them should be stricken." *Id.* at § 1380.

"[T]he action of striking a pleading should be sparingly used by the court[.]" *Coney*, 689 F.3d at 379 (quoting *Augustus*, 306 F.2d at 868). "[S]triking a portion of a pleading is a drastic

remedy[.]" *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868).  Consequently, "motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868).  "Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." Wright & Miller, *supra*, at § 1382.

### C. Analysis

In short, the Court will deny United's motion to strike.  United conflates two issues: (a) whether claims by A-patients (if any) are viable, and (b) whether allegations related to A-patients have "no possible relation to the controversy[.]" *Coney*, 689 F.3d at 379.  The latter is the key question for a Rule 12(f) motion to strike, and Omega clearly meets this standard.

Again, the heart of Plaintiff's law suit is described in the *Second Amended Complaint* as follows:

> United would recoup alleged overpayments not by seeking to recover those funds from the originally treated United Group Health Plan member (hereinafter, the "A-patient"), but by unilaterally underpaying amounts due to Omega and out-of-network providers for more recently treated United Group Health Plan members, often covered by entirely different employer plans (hereinafter, the "B-patient").

(*Sec. Amend. Compl.* ¶ 10, Doc. 130.)  Thus, as Omega argues, allegations related to A-patients are intertwined with allegations related to B-patients.

United inadvertently admits this. In arguing that A-patient allegations are immaterial and should be stricken, United asserts: "Because each of Omega's causes of action are premised on allegations related to A-patients, Omega's [*Second Amended Complaint*] must be dismissed." (Doc. 135-1 at 19.)  But claims that are "premised on" A-patient allegations certainly cannot be said to have "no possible relation to the controversy." *Coney*, 689 F.3d at 379.

United's other arguments are unavailing.  It claims that it need not show prejudice, but, even if that were true (which does not appear to be the case given the "general judicial agreement" discussed above, Wright & Miller, *supra*, at § 1382), it is of no moment because United cannot show immateriality.  United also raises in its reply brief the issue of a conflict between Omega representing A-patients and B-patients, but "[c]ourts in the Fifth Circuit have determined that new arguments raised for the first time in a reply brief need not be considered." *Murillo v. Coryell Cty. Tradesmen, LLC*, No. 15-3641, 2017 WL 1155166, at *3 (E.D. La. Mar. 28, 2017) (citing *Eitzen Bulk A/S v. Capex Indus., Ltd.*, No. 10-395, 2010 WL 5141257, at *3 (E.D. La. Dec. 13, 2010) (Berrigan, J.) (determining that the Court would not consider new arguments regarding the res judicata effect of a prior action because they were raised for the first time in a reply brief); *Cooper v. Faith Shipping*, No. 06-892, 2008 WL 5082890, at *4 (E.D. La. Nov. 25, 2008) (Vance, J.) (declining to consider new arguments presented for the first time in a reply brief "long after" the initial motion was filed)).  Lastly, United's other arguments about the Court previously dismissing the A-patient claims and about Omega failing to produce A-patient assignments may be relevant for the Rule 12(b)(6) analysis, but they do not control the instant issue.

Again, the Rule 12(f) standard is a "heavy burden," *Gilchrist*, 321 F.R.D. at 302, and a "high bar," *Global Adr*, 2003 WL 21146696, at *1.  "[M]otions under Rule 12(f) are viewed with disfavor[,] . . . are infrequently granted" and, if granted, result in a "drastic remedy." *Niblo*, 821 F. Supp. at 449.  And, "[a]ny doubt about whether the challenged material is  . . . immaterial . . . should be resolved in favor of the non-moving party," Wright & Miller, *supra*, at § 1382.  Considering these guidelines and the above analysis of the law and *Second Amended Complaint*, the Court finds that United's motion to strike A-patient allegations (and, indeed, the entire operative complaint) must be denied.

III.    **Motion to Dismiss for Lack of Standing**

A.  **Legal Standard**

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S. Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. Pursuant to Rule 12(b)(1), a claim " 'is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Moreover, when a complaint could be dismissed for both lack of jurisdiction and failure to state a claim, 'the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6)." *Crenshaw-Logal v. City of Abilene*, 436 F. App'x. 306, 308 (5th Cir. 2011) (quoting *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). This practice prevents a court from issuing advisory opinions. *Id.* at 308 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S. Ct. 1003, 140 L.Ed.2d 210 (1998)).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A

facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate General of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. June 12, 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523. Whereas, "[a] factual attack challenges the existence of subject matter jurisdiction, in fact, irrespective of the pleadings, and matters outside the pleadings such as testimony and affidavits may be considered." *Harmouche*, 313 F.Supp.3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (quotation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### B. Failure to Produce Assignments

#### 1. Parties' Arguments

United first argues that Omega lacks standing to assert claims on behalf of participants where it does not have a valid assignment of benefits. (Doc. 135-1 at 20–21.) The operative Claims Spreadsheet list 121 claims for B-patients, yet Omega produced only 47 assignments. But some of these are not even assignments; they are "payment agreements" that merely state that the signatory "executed the Assignment of Benefits . . . simultaneously with [their] execution of this

Payment Agreement." (Doc. 135-1 at 21 (citing Genovese Decl. ¶ 14, Ex. H at 1).)  Thus, says United, "with respect to 81 claims, Omega has failed to produce any assignment of benefits and those claims should be dismissed." (Doc. 135-1 at 21–22.)  This is particularly true because this is a "factual attack" on jurisdiction, so Omega was required to produce evidence and prove standing by a preponderance of the evidence.

Omega responds by relying on *Encompass Office Solutions, Inc. v. Connecticut General Life Insurance Co.*, No. 11-2487, 2017 WL 3268034 (N.D. Tex. July 31, 2017).  There, according to Omega, the insurer argued that the provider lacked standing because it could not produce 169 assignments of "as many as 1,245 claims for benefits." (Doc. 139 at 11 (citation omitted).)  The provider filed a motion for summary judgment asserting that proof of a written assignment was not required under Texas or federal law to establish an effective assignment of healthcare benefits.  The provider also submitted evidence that, *inter alia*, it routinely received assignments from patients and that it was standard practice to require patients to execute them. Omega argues that the district court granted summary judgment for the provider and explained that assignments may be established by direct or circumstantial evidence and that assignments of benefits need not be in writing.  Omega maintains that it need only produce evidence of one assignment from an A-patient and B-patient to have standing and that the "actual number of assignments that Omega is able to produce is potentially relevant only to the issue of Omega's damages, an issue for another day." (Doc. 139 at 12.)  Plaintiff submits a declaration that purports to make this case substantially similar to *Encompass*.  Omega argues that, if summary judgment for the provider was appropriate in *Encompass*, then Omega has satisfied its burden for this motion.

United replies first by emphasizing that, since this is a "factual attack," Omega must prove subject matter jurisdiction by a preponderance of the evidence.   United then says that Omega's

reliance on *Encompass* is "misplaced for several reasons." (Doc. 145 at 10.)  First, the Fifth Circuit decision of *Cell Science Systems Corp. v. Louisiana Health Service*, 804 F. App'x 260 (5th Cir. 2020), "eviscerates Omega's arguments that it can bring these claims and that '[t]he actual number of assignments that Omega is able to produce is potentially relevant only to the issue of damages.'" (Doc. 145 at 10 (quoting Doc. 141-1 at 7).)  According to United, the Fifth Circuit affirmed the lower court's dismissal for lack of standing because the provider had failed to attach any purported assignments.  United also notes that, in *Encompass*, plaintiff had produced assignments for 85% of their claims but failed to do so for 169 of 1,245 assignments.  Conversely, here, Omega produced only about a third of the assignments for their claims.  Thus, "Omega's contention that the missing assignments once existed, but were later 'lost or misfiled,' as in *Encompass*, strains credulity." (Doc. 145 at 11 n.8.) Second, unlike *Encompass*, Omega was operating under a court order to produce actual assignments. (Doc. 145 at 11.)

### 2. Applicable Law

"ERISA does not supply the provider with a basis for bringing its claim directly against" the plan administrator or fiduciary; "instead, the provider's standing to bring this lawsuit must be derived from the beneficiary and it is subject to any restrictions contained in the plan." *Dialysis Newco*, 938 F.3d at 250 (citing *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 353 (5th Cir. 2002)).  Contrary to Omega's position, standing is "a jurisdictional issue," and this Court must treat it as such. *See Cell Sci.*, 804 F. App'x at 262 (collecting cases).

" 'ERISA health care benefits are assignable. ERISA contains no anti-assignment provision with regard to health care benefits of ERISA-governed medical plans, nor is there any language in the statute which even remotely suggests that such assignments are proscribed or ought in any way

to be limited.' " *Id.* at 264 (quoting *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1289 (5th Cir. 1988) (*Hermann I* )).

Thus, for example, in *Cell Science*, an out-of-network provider sought benefits from a plan administrator for certain tests it provided pursuant to alleged assignments of benefits from patients. *Id.* at 261. The district court granted the administrator's motion to dismiss for lack of standing. *Id.* at 261–62. On appeal, the plan administrator argued, among other things, that the provider "failed to disclose assignment forms for several of the claimed patients" and that it had made a factual attack that the provider had not "obtained valid assignments on behalf of all claimed participants. Accordingly, the burden then shifted to [the provider] to produce evidence of valid and enforceable assignments." *Id.* at 264–65. In affirming the dismissal, the Fifth Circuit explained:

> Yet, despite having leave to amend its complaint and to file supplemental briefs, [the provider] did not submit any materials attempting to prove subject matter jurisdiction, instead focusing on its contention that it should not have to provide evidence at this stage in the pleadings. However, as our precedent makes clear, Rule 12(b)(1) requires the district court to evaluate jurisdiction, with the burden of proof on [the provider]. [The provider] nevertheless failed to attach any of the purported assignments to its complaint, its amended and supplemental complaint, or any of the four briefs submitted in response to the pending motion to dismiss. As the district court noted, this repeated failure undermines the allegation that [the provider] had obtained valid assignments of rights it asserts herein. Because [the provider] failed to meet its burden of proving, by a preponderance of the evidence, that it had obtained valid assignments, the district court correctly concluded that [the plan administrator] is entitled to dismissal.

*Id.* at 265.

Conversely, in *Encompass*, a surgical suite vendor filed suit against a plan administrator for denial of benefits under Texas law and ERISA. *Encompass*, 2017 WL 3268034, at *1. The administrator argued that the provider could not "pursue claims under ERISA on behalf of the individual plan participants for whom it does not possess an assignment of benefits." *Id.* at *6.

There were as many as 1,245 claims for benefits, but there were no assignments for 169 of those claims. *Id.* The provider submitted to the court some of the signed assignments of benefit forms and the "undisputed deposition testimony" of its corporate deponent, who said that, though the provider could not locate some written assignments that "may have been accidentally destroyed or misplaced in physician charts or files, it obtained a signed 'Assignment of Benefits' form from every patient." *Id.* at *8. The representative's testimony on this issue was "unequivocal," and she said with "100 percent positiveness [that] all assignment of benefits were signed." *Id.* at *8–9. After considering this evidence, the district court found:

> The court concludes that, taken together, [the provider's] evidence of signed "Assignment of Benefits" forms and [the representative's] testimony that all patients signed an "Assignment of Benefits" form is sufficient under Texas law to satisfy Plaintiff's burden as the summary judgment movant of establishing that it obtained valid assignments from every patient notwithstanding [the administrator's] contention that [the provider] has failed to produce copies of some of the signed "Assignment of Benefits" forms. . . .
>
> . . .
>
> [The administrator's] contention that [the provider] lacks prudential standing because it did not produce copies of all the approximately 1,200 "Assignment of Benefits" forms signed by patients is unavailing because, as previously explained, an assignment of benefits may be established by direct or circumstantial evidence, and, unlike an assignment of a fiduciary duty claim under ERISA, an assignment of a claim for benefits need not be in writing to be effective unless required by contract or statute.

*Id.* at *9–10.

Additionally, it is important to note that the Court must "interpret the assignment form in accordance with [state] contract law principles and [plan documents] under ERISA principles." *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005). Under Louisiana law, "[a]ll rights may be assigned, with the exception of those pertaining to obligations that are strictly personal." La. Civ. Code art. 2642.

29

Critically, "[n]o special forms or words are required to constitute a valid assignment, nor does the transfer have to be in writing." *Conerly Corp. v. Regions Bank*, 668 F. Supp. 2d 816, 828 (E.D. La. 2009) (citing *Katz v. Saruessen*, 476 So. 2d 16, 19 (La. Ct. App. 1985); *Producing Manager's Co., Inc. v. Broadway Theater League of New Orleans, Inc*., 288 So.2d 676, 679 (La. Ct. App. 1974)); *see also Louisiana Mobile Imaging, Inc. v. Ralph L. Abraham, Jr., Inc*., 44,600 (La. App. 2 Cir. 10/14/09); 21 So. 3d 1079, 1082 ("An assignment is a valid transfer of rights and may be done orally. An oral assignment must be proved like any other fact." (citations omitted)). *Cf.* La. Civ. Code art. 1832 ("When the law requires a contract to be in written form, the contract may not be proved by testimony or by presumption, unless the written instrument has been destroyed, lost, or stolen.").

"A party who demands performance of an obligation must prove the existence of the obligation." La. Civ. Code art. 1831. "A party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction." *Id.* "Louisiana jurisprudence has established that the party demanding performance bears the burden of proving the obligation by a preponderance of the evidence." *Id.*, comment (b).

### 3. Analysis

Having carefully considered the matter, the Court will deny the motion to dismiss on this issue. Preliminary, neither *Cell Science* nor *Encompass* are binding on this Court, as *Cell Science* is an unpublished per curiam decision and *Encompass* is a district court decision from Texas. *See* U.S. Ct. of App. 5th Cir. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are [generally] not precedent . . ."). However, the Court finds *Encompass* more persuasive because it is more factually and legally analogous.

30

As in *Encompass*, 2017 WL 3268034, at *8–9, Omega has brought forward evidence that its patients executed assignments by way of documentary evidence (*see* Docs. 135-11, 139-2, 139-3) and testimony from a representative with personal knowledge (Rousselle Decl., Doc. 139-1). With respect to the documentary evidence, the assignment forms clearly provide, "This is a direct assignment of my rights and benefits under this policy to Omega Hospital, LLC . . ." (*See*, *e.g.*, Ex. H, Doc. 135-11 at 4.)  The Payment Agreements present circumstantial evidence of the assignments, as the signed Payment Agreements provide, "I have executed the Assignment of Benefits and Instructions for Direct Payment to Omega simultaneously with my execution of this Payment Agreement." (*See.*, *e.g.*, Ex. H, Doc. 135-11 at 2.)

With respect to witness testimony, Karen Rousselle, Omega's Director of Operations & Compliance (Rousselle Decl. ¶ 2, Doc. 139-1), stated by declaration that (1) all of Omega's patients attend a "pre-op" meeting where, *inter alia*, "forms are completed by the patient, and the patient is informed of Omega's intent to bill the patient's health insurer for its services" (*id.* ¶ 8); (2) "Omega's standard practice is and always has been that the Assignment of Benefits is among the first forms signed by the patient during the pre-op meeting," and "[t]here are no exceptions because a signed Assignment of Benefits form is required by the health insurer for Omega to be paid for providing medical services" (*id.* ¶ 9); and (3) "[m]edical services are not provided by Omega unless a signed Assignment of Benefits form is on file," and "[a]ll medical services are provided on the condition that the patient executes the Assignment of Benefits" (*id.* ¶ 10).  As in *Encompass*, Rousselle's testimony on these points is "unequivocal." *Encompass*, 2017 WL 3268034, at *8–9.  Thus, between the documentary evidence and corporate representative's testimony, *Encompass* is factually on point.

31

*Encompass* is also in line legally.  United has failed to demonstrate that assignments cannot be "established by direct or circumstantial evidence," and United has demonstrated no "contract or statute" that requires that "an assignment of a claim for benefits . . .  be in writing to be effective." *Id.* at *10.  To the contrary, as shown above, assignments need not be in writing under Louisiana law and can be proven like any other fact. *See Conerly*, 668 F. Supp. 2d at 828; *Louisiana Mobile Imaging*, 21 So. 3d at 1082.[7]

Thus, *Encompass* is factually and legally similar to this case.  "[T]aken together," Omega's "evidence of signed 'Assignment of Benefits' forms [and Payment Agreements] and [Rousselle's] testimony that all patients signed an 'Assignment of Benefits' form is sufficient under [Louisiana] law to satisfy Plaintiff's burden" at this stage "that it obtained valid assignments from every patient notwithstanding [United's] contention that [the provider] has failed to produce copies of some of the signed 'Assignment of Benefits' forms." *Encompass*, 2017 WL 3268034, at *9.

Conversely, *Cell Science* is distinguishable.  In *Cell Science*, the Fifth Circuit made clear that the provider "did not submit *any* materials attempting to prove subject matter jurisdiction, instead focusing on its contention that it should not have to provide evidence at this stage in the pleadings." *Cell Sci*, 804 F. App'x at 265 (emphasis added). This echoes what the district court said: "Indeed, although [the provider] was granted leave to amend its Complaint, and file supplemental briefs, with full knowledge of the factual attack asserted in [the administrator's] motion, [the provider] failed to present *any evidentiary support* for its assertion of standing." *Cell Sci. Sys. Corp. v. Louisiana Health Serv. & Indem. Co*., No. 17-1658, 2018 WL 3978361, at *4 (M.D. La. Aug. 20, 2018), *aff'd sub nom. Cell Sci. Sys. Corp. v. Louisiana Health Serv*., 804 F.

---

[7] Even if an assignment had to be proved in writing (which it does not), "when the law requires a contract to be in written form, the contract may not be proved by testimony or by presumption, *unless the written instrument has been destroyed, lost, or stolen*." La. Civ. Code art. 1832.  Even United acknowledges that Omega claims to have lost the assignments (Doc. 145 at 11 n.8), so Omega can prove the assignment by "testimony" under Article 1832.

App'x 260 (5th Cir. 2020). Here, on the other hand, Omega has certainly submitted evidence—in the form of assignments, payment agreements, and deposition testimony—that it obtained valid assignments for all patients. Thus, *Cell Science* is not persuasive in this case.

Again, "[w]hen a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523. The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson*, 645 F.2d at 413. "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010.

That is not the case on this issue. Plaintiff has met its burden of proving by a preponderance of evidence that there is standing, even for those claims for which there is no assignment in the record. Accordingly, Defendants' motion will be denied on this issue.

### C. Lack of Connection to Dates of Service

#### *1. Parties' Arguments*

United next claims that at least fifteen of Omega's assignments were executed "up to ten years before or after the claimed date of service." (Doc. 135-1 at 22 (emphasis omitted).) According to United, "[c]ourts have rejected arguments that assignments can provide derivative standing in perpetuity for claims with dates of service removed from the date the assignment was executed." (*Id.* at 23.) Defendants rely primarily on *Infoneuro Grp. v. Aetna Life Insurance Co.*, No. 16-05083, 2019 WL 3006549 (C.D. Cal. May 3, 2019), and *University Spine Ctr. v. Empire Blue Cross Blue Shield*, No. 17-7573, 2018 WL 615676 (D.N.J. Jan. 29, 2018), where one allegedly held that assignments could not be effective if not signed on the date of service and the

33

other held that a moderate gap between the date of service and assignment rendered the assignment invalid.

Omega responds that the language of the assignments expresses an intent to convey all rights to benefits. Further, United's cases are "factually inapposite." (Doc. 139 at 13.) In *Infoneuro*, the provider required a new assignment on each day of service; conversely, Omega requires only "a single assignment, which covers all services rendered by Omega to the plan member." (Doc. 139 at 13–14.) Further, the assignments in *University Spine* failed for a number of other reasons as well; they did not identify the insurer or specify the scope of the assignment or benefits assigned. (*Id.* at 14 (citation omitted).) In any event, *University Spine* has been criticized twice in its own district, and United cites to no Fifth Circuit case on this issue. Further, the Rousselle declaration "demonstrates that Omega routinely obtains an executed Assignment of Benefits before the particular procedure is performed and provides United a copy of the assignment when appealing what Omega considers to be an adverse benefit determination." (*Id.*)

United replies by emphasizing that "many of the dates on the limited assignment forms Omega produced bear no relationship to the dates of service for which Omega is claiming an assignment." (Doc. 145 at 11.) United argues that Omega's position that it does not require a new assignment form for each date of service is contradictory and notes how (1) Omega produced multiple assignments for some patients; (2) produced some assignments that post-date the first claimed date of service; and (3) the Rousselle declaration states that an assignment was signed at the pre-op meeting with "no exceptions" and that the standard practice was to execute assignment forms. Thus, the temporal gaps should bar a knowing and effective assignment.

*2. Analysis*

Having carefully considered the matter, the Court will deny the motion to dismiss on this issue, largely for the reasons outlined in the previous section.  While United submits evidence that there were sometimes month-long and year-long gaps between the dates of service and certain assignments, some of which pre-dated and some of which post-dated the service (*see* Genovese Decl. ¶ 15, Doc. 135-3; Ex. I, Doc. 135-12), Omega has submitted other evidence, detailed above, that it had patients execute assignments for each date of service (Rousselle Decl. ¶¶ 8–10, Doc. 139-1).  Further, Rousselle also attests that "Omega's standard practice is to include a copy of the patient's executed Assignment of Benefits form in the package of materials whenever it is requested and when filing a first or second level appeal from an adverse benefit determination made by a health insurer." (*Id.* ¶ 12.)  All of this, combined with the assignments and payment agreements that are in evidence, is sufficient at this stage to prove standing.  Indeed, it would make little sense for the Court to deny a motion to dismiss when assignments are missing but grant it when there are assignments with temporal gaps.

Again, a Rule 12(b)(1) motion should be granted "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief," *Home Builders Ass'n of Miss.*, 143 F.3d at 1010, and the Court cannot say that is the case here.  For these reasons, the Court finds that *Infoneuro* and *University Spine* are unpersuasive authority and that Defendants' motion to dismiss on this issue must be denied.

### D.  Anti-Assignment Provisions

#### 1. Parties' Arguments

United next argues that, after the Court's ruling on the *Second Motion to Dismiss*, the Fifth

Circuit rendered a decision in *Dialysis Newco*, so the Court's prior reliance on *Rapides* is no longer

applicable.  According to United, *Dialysis Newco* stands for the propositions that:

> (i) [A]n anti-assignment provision "unambiguously prohibits assignment," (938 F.3d at 252), (ii) allowing patients to authorize direct payments to providers does not conflict with anti-assignment provisions and/or render them invalid, (*id.* at 254), and (iii) a form signed by a patient that merely authorizes a direct payment to a provider *does not convey the separate and distinct right to sue for those payments.* (*Id.* at 255.)

(Doc. 135-1 at 24.)  Further, *Cell Science* "again confirmed that there can be no valid assignment

of benefits when a controlling plan includes an anti-assignment provision." (Doc. 135-1 at 24.)

Here, at least 15 of the plans at issue contain anti-assignment provisions and clauses granting

discretion to pay providers directly even in the absence of a valid assignment.  Thus, "[u]nder

recent Fifth Circuit precedent, these provisions are enforceable[,] and the anti-assignment

provisions in the plans void any assignments that Omega purports to hold." (*Id.*)

Omega's response is two-fold.  First, Omega argues that the Court previously rejected

United's anti-assignment argument based on *Rapides*.  *Dialysis Newco* did not overrule *Rapides*

but rather distinguished it.  *Dialysis Newco* "addresses the enforceability of an anti-assignment

provision in the context of the assignment of a litigation claim" which "potentially conflicts with

ERISA's enforcement provision, and thus the presumption against preemption is unwarranted."

(Doc. 139 at 15 n.29.)  *Rapides*, on the other hand, "concerns the assignment of a claim to benefits,

which cannot conflict with ERISA's enforcement provision." (*Id.*)  Omega urges that the

"reasoning of *Rapides Parish* remains a compelling basis for rejecting United's argument." (*Id.*)

Second, Omega maintains that United should be estopped from asserting the anti-assignment provision "by the passage of time or its actions or inaction." (*Id.* at 15.) Omega cites a number of decisions from the Fifth Circuit in which insurers were "estopped . . . from asserting anti-subrogation clauses where the treatment provider obtained a clear and unambiguous assignment from the member/patient, confirmed coverage with the insurer, and the insurer failed to inform the provider of the anti-subrogation clause after it became clear that the provider was relying on the assignment." (*Id.* at 16.) Omega then relies on Rousselle's declaration to show how United never raised the anti-assignment clause as a defense despite multiple appeals over years. United's cases are distinguishable as "***not*** involving 'a course of conduct beyond direct reimbursement for medical services, including overpayment notifications and one or more repayment demands.' " (*Id.* at 19.) In any event, several courts have found the issue of equitable estoppel fact intensive and inappropriate for resolution without a complete record.

United replies that Omega's footnote about *Rapides* "does nothing to rebut United's points," though United does not elaborate beyond that. (Doc. 145 at 12.) United also relies on *Cell Science*, which laid out the elements of equitable estoppel; "*rejected* the argument that 'failing to assert the anti-assignment language until [litigation],' can estop a defendant from asserting that language;" and distinguished Omega's case by making the distinction between using an anti-assignment clause to deny a claim rather than to challenge jurisdiction. (*Id.* at 13 (citations omitted).) Lastly, Omega has not demonstrated "extraordinary circumstances" to claim estoppel; that requires a showing of "bad faith, fraud, or concealment," and Omega has failed to show that. (*Id.* at 14 (citations omitted).)

### 2. Anti-Assignment Clauses Generally

The Fifth Circuit has "previously noted 'Congress's intent that employers remain free to create, modify and terminate the terms and conditions of employee benefits plans without governmental interference.' " *Dialysis Newco*, 938 F.3d at 251 (quoting, 298 F.3d at 352 (citation omitted)). "As such, [the Fifth Circuit has] held that when an ERISA plan contains a valid anti-assignment provision, a putative assignment to a healthcare provider is invalid and cannot bestow the provider with standing to sue under the plan." *Id.* (citing *LeTourneau*, 298 F.3d at 352–53).

"When interpreting an ERISA plan, the provisions are read 'not in isolation, but as a whole.' " *Id.* (quoting *Dallas Cty. Hosp. Dist. v. Assocs.' Health and Welfare Plan*, 293 F.3d 282, 288 (5th Cir. 2002)). "The provisions are to be read according to their plain meaning and as they are likely to be 'understood by the average plan participant.' " *Id.* (quoting *Walker v. Wal-Mart Stores, Inc.*, 159 F.3d 938, 940 (5th Cir. 1998) (quoting 29 U.S.C. § 1022(a)(1))). "However, [the Fifth Circuit has] also held in broad terms that when construing an anti-assignment clause, 'any ambiguities will be resolved against the [p]lan.' " *Id.* (quoting *Dallas Cty.*, 293 F.3d at 288 (citing *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000))).

Here, the anti-assignment provisions in the Summary Plan Descriptions ("SPDs") and Certificates of Coverage ("COC") contain the following language (or materially similar language):

> You may not assign your Benefits under the Policy to a non-Network provider without our consent. When an assignment is not obtained, we will send the reimbursement directly to you (the Subscriber) for you to reimburse them upon receipt of their bill. We may, however, in our discretion, pay a non-Network provider directly for services rendered to you. In the case of any such assignment of Benefits or payment to a non-Network provider, we reserve the right to offset Benefits to be paid to the provider by any amounts that the provider owes us. When an assignment is made without our consent, we will continue to reimburse non-Network Hospitals directly for services rendered by the Hospital.

(Genovese Decl. ¶ 28, Doc. 135-3.)  The Court finds that this language is clear and unambiguous and would invalidate the assignments—if (1) these "plan documents" are in fact controlling; (2) the anti-assignment clauses are valid; and (3) if United is not equitably estopped from using these provisions.  Here, the Court finds that United has failed to establish that the SPDs and COCs are plan documents.  As a result, the Court will deny the motion to dismiss as to these claims.

### 3. SPDs and COCs As Plan Documents

"An SPD need not be a plan document. In other words, a SPD may not contain the contractual terms of a plan, and where an SPD conflicts with the terms of the plan document, the terms of the plan document control for purposes of ERISA § 502(a)(1)(B)." *Manuel*, 905 F.3d at 865 (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 436–37, 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011)).  "This makes sense because ERISA § 502(a)(1)(B) provides only for the recovery of benefits due 'under the terms of a plan.' " *Id.*

United is correct that the Fifth Circuit has considered SPDs as the plan, but these cases are distinguishable.  For instance, in *Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340 (5th Cir. 2017), a pre-*Manuel* case, the appellate court explained, "where a plan has an SPD but no separate written instrument, the SPD can serve as the plan's written instrument." *Id.* at 344–45. Further, in distinguishing *Amara*, the appellate court stated, "We are not grappling with a conflict between an SPD and a written instrument but, instead, are deciding whether an SPD can function as a written instrument in the absence of a separate written instrument. As the district court correctly concluded, *Amara* does not bear on these facts." *Id.* at 345 & n.5. Here, however, there is no evidence from United that there is "no separate written instrument" or plan in this case.  Thus, *Rhea* appears distinguishable. *See Sigal v. Metro. Life Ins. Co.*, No. 16-3397, 2018 WL 1229845, at *7 (S.D.N.Y. Mar. 5, 2018) ("Unlike in *Rhea* and the cases it cites, MetLife cannot contend that

there is no 'separate written instrument,' . . . here: The Certificate clearly sets out the boundaries of the 'entire contract.'  MetLife has not carried its burden to 'demonstrate that the [Additional Information] is part of the Plan, for example, by [it] clearly stating on its face that it is part of the Plan.' " (citing *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011))).

Similarly, in *Dudley v. Sedgwick Claims Mgmt. Servs. Inc.*, 495 F. App'x 470 (5th Cir. 2012), the Fifth Circuit "treat[ed] [the SPD] as the plan . . . [b]ecause neither party point[ed] to an alternative plan document in the record, both parties rely on the [SPD] as the governing text, and only a plan can be enforced under § 1132(a)(1)(B)[.]" *Id.* at 471 n.1.  Here, however, both parties do not agree that the SPD is "the governing text."  Further, while "neither party points to an alternate plan document in the record," *Dudley* was decided at the summary judgment stage, not the motion to dismiss stage.  Lastly, the *Dudley* court emphasized that "the distinction between an SPD and a plan matters; the Supreme Court recently clarified that § 1132(a)(1)(B) allows beneficiaries to enforce the terms of a plan but not an SPD." *Id.* (citing *Amara*, 131 S. Ct. at 1877).

*Dudley* relied on *Koehler v. Aetna Health Inc.*, 683 F.3d 182 (5th Cir. 2012), where the "parties agree that the relevant plan provisions are found in the plan's 'Certificate of Coverage' ('COC'), which sets forth the plan's health insurance benefits." *Id.* at 185.  The appellate court noted that the COC constituted a SPD and thus a "separate document from the plan itself" but found "in this case the summary's text is simply a verbatim copy of the underlying plan provisions." *Id.*  The instant case is different, as (1) the parties do not agree that the SPD contains the terms of the plan and (2) it has not been established that the SPD's text is "a verbatim copy of the underlying plan provisions."

40

In sum, under Fifth Circuit case law, SPDs are not per se a part of the plan, despite United's representation that they "contain[] the terms and coverage of the member's health benefits plan pursuant to 29 CFR § 2520.102-3." (Hess Decl. ¶ 7, Doc. 135-2.)  Thus, United cannot rely on the anti-assignment provisions contained in those documents to invalidate Omega's assignments.

A different result may be warranted for the COCs.  Omega identifies certain evidence indicating that the COCs *are in fact* incorporated into the plan, though Omega complains that they are "merely one part of" it. (Doc. 139 at 7.)  Plaintiff points to a previously filed complete COC which defines "Policy" as "the entire agreement issued to the Enrolling Group" (i.e.," the employer or other . . . group, to whom the Policy is issued") that "includes all of the following:

- The *Group Policy*.
- **This** *Certificate***.**
- The *Schedule of Benefits*.
- The Enrolling Group's application.
- Riders.
- Amendments"

"These documents make up the entire agreement that is issued to the Enrolling Group." (Doc. 57-13 at 102–03 (emphasis added).)  Thus, in at least some instances, United's COCs are incorporated into the terms of the Plan, and, if that is the case, the anti-assignment clauses would be as well.

For the instant motion, United provided only portions of the COCs at issue. (*See* Genovese Decl. ¶ 26, Doc. 135-3 ("The cover page, table of contents, anti-assignment provision, and other relevant provision(s) for these plan documents are attached as **Exhibit M.**").)  The definitions section, from which the above COC language is pulled, is not included.  (*See* Ex. M, Doc 135-16.) Thus, the Court cannot determine at this time whether these COCs are similar to the complete COC Omega identified in the record.

Consequently, the Court will deny the motion to dismiss on this issue.  United can re-urge this motion at a later time after the entire plans have been produced for the remaining claimants.

#### *4. Closing Guidance*

Because the Court has an incomplete record, the Court declines any attempt to definitively apply *Rapides* and *Dialysis Newco*.  Doing so would require the Court to "delve into the labyrinthine complexities of ERISA law and practice." *Manuel*, 905 F.3d at 862 (citation and quotation omitted).  The Court fully appreciates the Fifth Circuit's sentiment that, "As all who wrestle with it know, ERISA is complicated." *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 347 (5th Cir. 2016).  These wise words appear particularly true here; *Dialysis Newco*'s reasoning appears to have completely gutted *Rapides*, *see Dialysis Newco,* 938 F.3d at 257–60, yet the former did not overrule the latter, *id.* at 259 n.11 (noting that *Rapides* was not "abrogated or [] otherwise bad law.").  Reconciling these cases is difficult.

That said, the Court's preliminary view of these cases is that, after *Dialysis Newco*, La. R.S. § 40:2010 would *not* invalidate the anti-assignment clauses.  La. R.S. § 40:2010 provides:

> Not later than ten business days after the date of discharge, each hospital in the state which is licensed by the Louisiana Department of Health shall have available an itemized statement of billed services for individuals who have received the services from the hospital. The availability of the statement shall be made known to each individual who receives service from the hospital before the individual is discharged from the hospital, and a duplicate copy of the billed services statement shall be presented to each patient within the specified ten day period. No insurance company, employee benefit trust, self-insurance plan, or other entity which is obligated to reimburse the individual or to pay for him or on his behalf the charges for the services rendered by the hospital shall pay those benefits to the individual when the itemized statement submitted to such entity clearly indicates that the individual's rights to those benefits have been assigned to the hospital. When any insurance company, employee benefit trust, self-insurance plan, or other entity has notice of such assignment prior to such payment, any payment to the insured shall not release said entity from liability to the hospital to which the benefits have been assigned, nor shall such payment be a defense to any action by the hospital against that entity to collect the assigned benefits. However, an interim statement shall be provided when requested by the patient or his authorized agent.

In *Dialysis Newco*, the Fifth Circuit made a clear distinction between a direct-payment authorization and an assignment of rights. "A direct-payment authorization means only that the beneficiary tells the administrator to forward the checks owed to him or her on to the provider instead." *Id.* at 254. "An assignment means that the provider has stepped into the metaphorical shoes of the beneficiary and is capable of exercising all the legal rights enjoyed by the beneficiary under the plan, to include suing the plan and/or its administrator over disputes that might arise in the plan's interpretation." *Id.* According to *Dialysis Newco*, La. R.S. § 40:2010, which was not preempted according to *Rapides*, "required administrators to honor direct-payment authorizations; however, the Tennessee statute at issue in" *Dialysis Newco*, which was held to be preempted, "require[d] administrator[s] to honor assignments and all the legal rights that flow therefrom—to include liability to be sued by a third party not otherwise in contractual privity with the plan." *Dialysis Newco,* 938 F.3d at 257. In sum, Louisiana's statute is only a direct payment statute and does not require administrators to honor assignments; if it did, it would be preempted like the Tennessee statute. *See id.* at 257–60. Thus, after *Dialysis Newco*, anti-assignment clauses are not invalidated by La. R.S. § 40:2010.

If La. R.S. § 40:2010 does not prohibit the anti-assignment clauses, then United is not estopped from using these provisions. "In order '[t]o establish an ERISA-estoppel claim, the plaintiff must establish: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances.' " *Cell Sci*, 804 F. App'x at 265 (quoting *Mello v. Sara Lee Corp*., 431 F.3d 440, 444–45 (5th Cir. 2005)). Here, Omega fails to establish the first two elements. As to the first, contrary to Omega's position, *Cell Science* distinguishes between invoking an anti-assignment clause to deny a claim, as was done in Omega's authority, *see, e.g., Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 572 (5th Cir.

43

1992) (*Hermann II*), and invoking an anti-assignment clause "as a challenge to jurisdiction." *Cell Sci*, 804 F. App'x at 265.  Here, as in *Cell Science*, "[t]here is no indication from the record that [the administrator] either misrepresented or misled [the provider] with respect to its intentions to enforce the anti-assignment clause in its plan." *Id.* (citing *Mello*, 431 F.3d at 445).

As to the second element, the Fifth Circuit "has held that a party's reliance is not reasonable if it is inconsistent with the clear and unambiguous terms of the plan documents." *Id.* at 265–66 (citing *Mello*, 431 F.3d at 447).  Similarly, Omega cannot prove reasonable and detrimental reliance.  Again, the anti-assignment clauses quoted above (Genovese Decl. ¶ 28, Doc. 135-3)  are clear and unambiguous, so, for this additional reason, Omega's estoppel argument fails.

Again, the Court makes no definitive ruling on these issues at this time.  The Court also hopes that the Fifth Circuit will provide further guidance on the relationship between *Dialysis Newco* and *Rapides* before United re-urges dismissal on this ground.

### E.  Claim for Declaratory and Injunctive Relief

#### 1. Parties' Arguments

United next argues that, while Omega no longer asserts claims for breach of fiduciary duty, in Count Three, it "still seeks to enjoin United from continuing to engage in recovering overpayments 'or other fund offsets' with respect to Omega and members of the purported class." (Doc. 135-1 at 24–25.)  But, this Court already held in its ruling on the *Second Motion to Dismiss* that "assignments of benefits from a patient  . . . cannot logically imply the right to assert ERISA claims for injunctive relief on behalf of that patient for services he or she may receive from other providers in the future." (*Id.* at 25 (quoting Doc. 90 at 24 (quoting *Premier Health* at 219)).)  Thus, based on the Court's prior ruling, Omega lacks standing to assert a claim for declaratory and injunctive relief  in Count Three, and those claims should be dismissed.

Omega responds that, under ERISA, assignees like Omega may "enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan" and may seek a declaratory judgment to obtain "appropriate equitable relief (i) to redress [ERISA] plan violations or (ii) to enforce any provision of this subchapter or the terms of the plan." (Doc. 139 at 19–20 (quoting 29 U.S.C. § 1132(a)(3)(B)).)  Declaratory relief can be obtained either to "establish 'the primacy of an ERISA obligation over some independent, potentially conflicting state law duty' " or "to establish 'that the party against whom it is brought has an obligation under ERISA which it is allegedly disregarding.'" (*Id.* at 20 (quoting *KLLM, Inc. v. Employee Health Protection Plan v. Ontario Community Hosp.*, 947 F. Supp. 262, 266–67 (S.D. Miss. 1996)).)  Further, while this Court relied on *Premier Health*, that Court later reconsidered its ruling and "changed course, ruling that since the putative class member's patient-assignors were subjected to United's recoupment procedures the right to challenge those procedures was a logical extension of the assignment of benefits, and included the right to seek injunctive and declaratory relief under ERISA[.]" (*Id.*) Omega quotes a large portion of a *Premier Health* opinion, though notes it was vacated on other grounds by another decision which "affirmed the right of the class to pursue claims for injunctive and declaratory relief." (*Id.* at 21 n.50.)  In sum, as in *Premier Health*, "seeking injunctive and declaratory relief is a 'logical extension of [the providers'] right to receive those benefits' and is thus permissible under both the terms of the Assignment of Benefits and ERISA." (*Id.* at 21.)

United responds that the claims for injunctive and declaratory relief have been rejected by this Court. Count Three of the operative complaint is a "carbon copy of the causes of action that this Court found Omega did *not* have derivative standing to assert in the First Amended Complaint." (Doc. 145 at 14 (citing Doc. 41 ¶¶ 97–98, Doc. 130 ¶¶ 84–85).)  According to United, Omega offers no new argument as to why the Court's prior ruling was wrong.  "The fact remains

that Omega's AOBs 'do not refer specifically to fiduciary or other non-benefit ERISA claims [and therefore] do not assign non-benefits claims to the plaintiff.' " (*Id.* at 14 (quoting Doc. 90 at 25–26).)

## 2. Analysis

This Court previously granted the *Second Motion to Dismiss* Count Three on two grounds. First, the Court found *Premier Health* instructive when it looked at certain assignment language and found that an " 'assignment of benefits from a patient for services by a given healthcare provider cannot logically imply the right to assert ERISA claims for injunctive relief on behalf of that patient for services that he or she may receive from other providers in the future,' " as doing so " 'would unknowingly deprive the subscriber of standing to assert those claims in the future.' " (Doc. 90 at 23–24 (quoting *Premier Health*, 292 F.R.D. 204, 218–19 (N.J.D.C. 2013)).) The Court found that Omega's assignments similarly "fail[ed] to encompass prospective claims for injunctive relief," explaining:

> Here, the assignments clearly assign to Omega the right to file suits and pursue claims against the patient-assignee's insurance company to seek reimbursements, benefits, and recover other amounts for 'services rendered' by Omega. Importantly, however, this assignment does not give Omega the right to pursue prospective injunctive or declaratory relief for its patients on future claims for reimbursement and benefits. The assignment specifically qualifies the assignment of rights to those for past services provided by Omega (i.e., "services rendered").

(*Id.* at 25.)

Omega now attacks the first basis for the Court's decision and argues that *Premier Health* reversed course. There are reasonable grounds for that.[8]

---

[8] In a later decision, *Premier Health* somewhat limited its earlier decision:

> This [earlier] ruling, however, was specific to where providers sought injunctive relief regarding conduct to which their patient-assignors were not subject and might encounter only when seeking treatment from other providers in the future. *See id.* Consequently, the injunctive relief sought was well-outside the logical scope of those patient assignments.

However, Omega fails to address the second basis for the Court's decision.  Specifically, the Court dismissed Count Three because precedent in the Fifth Circuit found that "assignments that do not refer specifically to fiduciary duty or other non-benefits ERISA claims do not assign non-benefits claims to the plaintiff." (Doc. 90 at 25 (citing *Grand Parkway Surgery Ctr., LLC v. Health Care Serv. Corp.*, No. 15-0297, 2015 WL 3756492 (S.D. Tex. June 16, 2015); *Houston Home Dialysis, LP v. Blue Cross & Blue Shield of Texas, a Div. of Health Care Serv. Corp.*, No. 17-2095, 2018 WL 2562692, at *3 (S.D. Tex. June 4, 2018))  That is, "only an express and

---

Here, however, the ONET Repayment Demand Class members' patient-assignors were subject to Defendants' overpayment recoupment procedures. Therefore, as the Court previously held, a "challenge to the procedures used to recover overpayments of benefits assigned to [healthcare providers] is a logical extension of their right to receive those benefits." *Id.* at 221. And a challenge to these procedures under ERISA may undoubtedly include declaratory and prospective injunctive relief against "any act or practice which violates any provision" of ERISA. 29 U.S.C. § 1132(a)(3)(A).

*Premier Health Ctr., P.C. v. UnitedHealth Grp.*, No. CIV. 11-425 ES, 2014 WL 4271970, at *14 (D.N.J. Aug. 28, 2014), *order vacated on denial of reconsideration*, No. CIV. 11-425 ES, 2014 WL 7073439 (D.N.J. Dec. 15, 2014). In ruling on the motion for reconsideration, the *Premier Health* court again affirmed the plaintiff's right to seek prospective relief, this time quoting from the earlier opinion:

Defendants argue that the subscriber status of the ONET Repayment Demand Class members' patient-assignors creates individual standing issues because the class seeks declaratory and injunctive relief regarding future repayment demands on benefit claims that have yet to be submitted on behalf of other United-insureds in the future. Therefore, according to Defendants, the Court would have to examine the subscriber status of the class members' patient-assignors because "[p]atients who are not currently members of plans insured or administered by United . . . do not have statutory or constitutional standing to bring claims against United seeking forward-looking relief." (Def.'s Br. Opp. Cert. 25.)

This argument is a red herring. While the patient-assignors who are no longer United insureds may not submit future benefit claims to United that would be subject to future repayment demands, the fact remains that there are pending repayment demands regarding claims while they were United-insureds. Thus, in challenging United's overpayment recoupment procedures, those patient-assignors would necessarily seek prospective relief because the repayment demands on their claims have yet to be resolved. That such relief may also apply to benefit claims of other United-insureds is of no moment, as it would not in any way restrict those individuals' rights or ability to sue under ERISA

*Premier Health Ctr.*, 2014 WL 7073439, at *5 (quoting *Premier Health Ctr.*, 2014 WL 4271970, at *15–*16).  The district court said of this, "The Court sees no reason to alter its ruling here." *Id.*

47

knowing assignment of an ERISA fiduciary claim is valid." (*Id.* at 26 (quoting *Texas Life, Accident, & Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Ent. Co.*, 105 F.3d 210, 218 (5th Cir. 1997).) Since the assignments at issue contained "no express reference to fiduciary duty claims, or the assignment of future rights for that matter, . . . all of Omega's breach of fiduciary claims must fail for lack of standing." (*Id.*)

In short, Plaintiff has failed to offer adequate grounds for reversing its prior ruling dismissing an almost verbatim Count Three. (*Compare Sec. Amend. Compl.* ¶¶ 83–85, Doc. 130, *with First Amend. Compl.* ¶¶ 96–98, Doc. 41). Ultimately, the assignments at issue did not encompass the right for non-benefit or future claims. *See Grand Parkway*, 2015 WL 37564922; *Houston Home Dialysis*, 2018 WL 2562692, at *3. As a result, the Court will dismiss Count Three for lack of standing.

## IV.    Motion to Dismiss for Failure to State a Claim

### A.  Legal Standard

Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

To satisfy Rule 8(a), "[t]he complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) " 'Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable

expectation that discovery will reveal [that the elements of the claim existed].' " *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

### B.  Count One: Procedural Section 502(a)(1)(B) Claims

#### *1. Parties' Arguments*

United first argues that Count One should be dismissed. United explains how, after the Court's ruling on the *Second Motion to Dismiss*, Omega decided to "fold" the issue of failure to provide full and fair review under 29 U.S.C. § 1133 into Omega's "claim for benefits." (Doc. 135-1 at 25.) The Court previously held that "§ 1133 does not provide a stand-alone cause of action

for compensatory relief," but Omega still cites to the same provision to support its Count One. (*Id.* at 25–26 (citing Doc. 90 at 36).)  "Omega tries to dress up a claim that the Court has previously rejected, and the effort is ineffective.  Omega also continues to ignore this Court's holding that 'the ERISA Plan, itself, is the only proper defendant in a Section 503 claim.' " (*Id.* at 26 (quoting Doc. 90 at 35).)  Since the Court already determined that these problems were fatal to Omega's claim, the Court must dismiss Count One.

Omega responds that United mischaracterizes Omega's claim.  "Contrary to United's assertion, Omega does not seek damages in a separate count for procedural violations of ERISA's regulatory requirements.  Rather, as discussed in the *Manuel v. Turner Industries*, *supra*, Omega makes these assertions in the context of its benefit claims under Section 502(a)(1)(B)." (Doc. 139 at 22.)  Omega maintains that its "requested relief for [United's] violations remains repayment of benefits that United has improperly recouped via cross plan offset or offset against other funds belonging to or owed to the provider and is thus cognizable under § 502(a)(1)(B)." (*Id.*)

United responds that, while the Fifth Circuit " 'has allowed claims administrative issues to be raised in § 502(a)(1)(B) causes of action,' these causes of action are limited by *Singletary* to where 'a participant [brings] an action to recover benefits . . . *under the terms of the plan*.' " (Doc. 145 at 14–15 (quoting *Singletary v. United Parcel Service, Inc.*, 828 F.3d 342, 349 (5th Cir. 2016) (quotations omitted)).)  "In contrast, where a plaintiff seeks 'to reform the Plan by obtaining a declaration that the provisions are void[,] Section 1132(a)(1)(B) does not authorize such a claim." *Id.* (quoting *Singletary*, 828 F3d at 349).)  Thus, according to United, Omega "cannot bring a claim that United's methods for identifying and recovering overpayments procedurally violates ERISA under § 502(a)(1)(B)." (*Id.* at 15.)

### *2. Applicable Law*

ERISA "has at least six civil enforcement provisions." *Singletary*, 828 F.3d at 347 (citing 29 U.S.C. § 1132(a)(1)–(6); *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 144, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)). ERISA § 502(a)(1)(B), codified as 29 U.S.C. § 1132(a)(1)(B), provides that "[a] civil action may be brought . . .by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

However, a claim "cannot arise *under the terms of the Plan* [if] coverage for a beneficiary . . . does not exist in the Plan." *Singletary*, 828 F.3d at 347. "Importantly, to succeed under Section 1132(a)(1)(B), the claimant must show that he or she 'qualif[ies] for the benefits provided in that plan.' " *Id.* at 348 (quoting *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 583 (2d Cir. 2006)). "For this cause of action, courts do not look for equitable or other reasons the insurer should provide benefits not strictly owed under the Plan." *Id.* "That is not to say ERISA has no door through which such claims can proceed, but Section 1132(a)(1)(B) is not open to such a claim." *Id.*

Thus, for example, in *Singletary*, an UPS employee participated in a plan that provided group life insurance coverage to UPS employees. *Id.* at 345. The plan allowed employees to purchase supplemental dependent life insurance for "Qualified Dependents." *Id.* at 346. Plaintiff purchased such insurance for her husband. *Id.* "Under the Plan, however, a 'spouse [or] Domestic Partner . . . is not [a] Qualified Dependent while . . . on active duty in the armed forces of any country." *Id.* Plaintiff's spouse died while on active duty. *Id.* The plan carrier denied coverage, and the UPS employee filed suit. *Id.* The district court granted summary judgment to UPS and the plan carrier. *Id.*

51

In affirming, the Fifth Circuit explained, "Section 1132(a)(1)(B) would provide relief had [the plan carrier] failed to follow the terms of the Plan, but it does not provide relief from a proper application of those terms." *Id.* at 348.  Plaintiff employee was "not seeking to enforce the Plan. She instead is seeking relief from the provisions of the Plan because of lack of notice of something that she does not dispute is actually in the Plan." *Id.*  Plaintiff was arguing that the plan carrier "should be estopped from relying on the exclusion." *Id.* "An equitable claim such as this one can be brought, but 'failure to comply with ERISA's SPD requirements cannot be the basis for a [Section 1132](a)(1)(B) benefit claim.' " *Id.* (quoting 1 Lee T. Polk, ERISA Practice and Litigation § 3:23 (2016)).  The Fifth Circuit went on to rely on an Eighth Circuit case which "stressed the difference between bringing a claim for benefits under a plan and bringing a claim for equitable relief":

> Although his ultimate goal is to continue receiving disability income benefits . . . section [1132](a)(1)(B) authorizes a participant to bring an action to recover benefits . . . *under the terms of the plan*. Ross is not seeking to obtain benefits under the terms of the Plan. Rather, he is seeking to reform the Plan by obtaining a declaration that the purported [Plan provisions] are void. Section [1132](a)(1)(B) does not authorize such a claim.

*Id.* at 349 (quoting *Ross v. Rail Car Am. Grp. Disability Income Plan,* 285 F.3d 735, 740 (8th Cir. 2002)).  The *Singletary* court went on to conclude that Plaintiff had no cause of action under Section 1132(a)(1)(B) as pled. *Id.*

The Fifth Circuit also provided analysis of ERISA § 502(a)(1)(B) claims in *Manuel*.  There, one issue was whether a claim under ERISA § 502(a)(3) was duplicative of a claim under § 502(a)(1)(B), as, "[a] claimant whose *injury* creates a cause of action under [ERISA § 502(a)(1)(B)] may not proceed with a claim under [ERISA § 502(a)(3)]." *Manuel*, 905 F.3d at 865 (quoting *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc*., 892 F.3d

719, 733 (5th Cir. 2018) (emphasis added) (citation omitted)).  Unlike ERISA § 502(a)(1)(B),

ERISA § 502(a)(3) provides that a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which
> violates any provision of this subchapter or the terms of the plan, or (B) to obtain
> other appropriate equitable relief (i) to redress such violations or (ii) to enforce any
> provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3).  The district court had dismissed certain claims as duplicative, specifically

that the insurer was liable (1) for denying long term disability benefits at the last level of appeal

and (2) for failing to identify the independent medical reviewer who recommended denying

Plaintiff's claim on appeal. *Id.* at 866–67.  Plaintiff claimed this conduct violated ERISA's claims

procedure "which require that plan participants be provided with 'adequate notice in writing' of

'the specific reasons' for an adverse benefit determination and an 'opportunity' for 'full and fair

review' of such decision upon appeal." *Id.* at 867 (quoting ERISA § 503, 29 U.S.C. § 1133).[9]  In

evaluating whether the Plaintiff's alleged injury created a claim under ERISA § 502(a)(1)(B), the

Fifth Circuit explained:

> "[I]n an ERISA action under [ERISA § 502(a)(1)(B) ], a claimant may question the
> completeness of the administrative record; whether the plan administrator complied
> with ERISA's procedural regulations; and the existence and extent of a conflict of
> interest created by a plan administrator's dual role in making benefits
> determinations and funding the plan." *Crosby v. La. Health Serv. & Indem. Co.*,
> 647 F.3d 258, 263 (5th Cir. 2011) (footnotes omitted). And in an unbroken line,
> even after *Singletary*, this court has allowed claims administration issues to be
> raised in ERISA § 502(a)(1)(B) causes of action. *See, e.g.*, *White v. Life Ins. Co. of
> N. Am.*, 892 F.3d 762, 769–70 (5th Cir. 2018).

---

[9] This statute provides in full:

In accordance with regulations of the Secretary, every employee benefit plan shall--

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits
under the plan has been denied, setting forth the specific reasons for such denial, written in a manner
calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for
a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C.A. § 1133.

*Manuel*, 905 F.3d at 867.  The appellate court then concluded, "Since, under existing law, plaintiffs may attack problematic administrative claims procedures under ERISA § 502(a)(1)(B), we affirm the district court's decision to dismiss these claims under ERISA § 502(a)(3)." *Id*.[10]

### 3. Analysis

In short, the Court will deny United's motion to dismiss the procedural claims in Count One.  Omega correctly relies on *Manuel* that these procedure-related claims can still be brought under ERISA § 502(a)(1)(B).  *Manuel* clearly states that, under this provision, "a claimant may question the completeness of the administrative record; whether the plan administrator complied with ERISA's procedural regulations; and the existence and extent of a conflict of interest created by a plan administrator's dual role in making benefits determinations and funding the plan." *Id*. at 867 (citing *Crosby*, 647 F.3d at 263).  Further, "in an unbroken line, even after *Singletary*, this court has allowed claims administration issues to be raised in ERISA § 502(a)(1)(B) causes of action." *Id*. (citations omitted).

Omega has made these procedural claims.  Specifically, Omega alleges that certain procedures related to adverse benefit determinations, such as being given a reasonable opportunity

---

[10] The Fifth Circuit also noted certain "tension" in the jurisprudence:

> Like his claim for alleged deficiencies in the SPD, [plaintiff] seeks redress for an injury—failing to comply with the procedural requirements of ERISA § 503—that appears unrelated to the terms of the plan. While the plan itself might permit the assertion of new grounds for denial of claims at the last level of appeal or the nondisclosure of medical experts, ERISA might require different, more participant friendly, procedures. In such a case, a claims administrator might, under the logic in *Singletary*, skirt liability under ERISA § 502(a)(1)(B) by hewing to the terms of the plan. 828 F.3d at 348. Then, in the absence of a cause of action under ERISA § 502(a)(3), the underlying injury, caused by a violation of ERISA § 503, could go unremedied. However, this tension between remedying claims administration defects under one cause of action and summary plan description defects under another has not been raised or explored in the briefing. Further, since both *Singletary* and this court's claims administration jurisprudence represent binding precedent, correcting this inconsistency of approach would require *en banc* review.

*Manuel*, 905 F.3d at 867 n.4.

to appeal benefits and a full and fair review of claims, were not followed through the cross-plan offsetting (*Sec. Amend. Compl.* ¶¶ 65–67, Doc. 130; 29 C.F.R. § 2560.503-1(g)), Omega claims that this was a violation of ERISA *and* the plan:

> United sought to compel Omega and the Class members to repay previously paid benefits without complying with either the terms, conditions, and procedures required by ERISA for addressing adverse benefit determinations, *or by the plan terms*, and by exceeding the range of equitable remedies accorded them under ERISA. Omega and the putative Class members pursue return of these improperly confiscated and hence now unpaid benefit amounts pursuant to the A-patient assignment of benefits under 29 U.S.C. § 1132(a)(1)(B).

(*Id.* ¶ 71 (emphasis added).)  Plaintiff also alleges that the cross-plan offsetting is "an unlawful conflict of interest under ERISA, particularly, but not exclusively, in those circumstances where United administers both fully insured and self-insured plans." (*Id.* ¶ 74.)  Thus, Count One is seeking relief under *Manuel*, and the motion to dismiss on this issue will be denied.

In closing, the Court has a final comment about United's argument that *Singletary* bars Omega's § 502(a)(1)(B) claim.  On a Rule 12(b)(6) motion, the Court may also consider other sources outside of the complaint, such as documents incorporated into the complaint by reference and matters of which the court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Here, United attaches SPDs and COCs which it claims are part of the plan  (which is referenced throughout the *Second Amended Complaint*) and which it claims support cross-plan offsetting. (*See, generally*, Ex. K, Doc. 135-14; Ex. M, Doc. 135-16.)  However, there are two problems with these documents. First, as discussed above (and again below), United has failed to establish that these reflect the terms of the plans.  Second, United has not produced the entire plans at issue, and they are not a part of the record.  Under the record currently before it, the Court cannot determine whether Omega truly does seek relief "under the terms of the plan."  Thus, United's motion to dismiss based on *Singletary*, an argument made in United's reply brief

that need not be considered, *Murillo*, 2017 WL 1155166, at *3, will be denied without prejudice, subject to refiling when the record is more fully developed.

### C. Claim for Benefits Under Counts One, Two and Four

#### *1. Parties' Arguments*

United next contends that Omega failed to state a viable claim for any ERISA violation. First, United asserts that Omega errs in arguing that the plan documents do not allow cross-plan offsetting. The *Second Amended Complaint* describes certain categories of plan documents, but these variations "each include key terms that have been held by the Fifth Circuit to create a contractual right to recover overpayments through both same-plan and cross-plan offsetting." (Doc. 135-1 at 27 (citing *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 730 (5th Cir. 2010)).) "Thus, based on the terms in the plan documents, Counts One, Two, and Four seeking benefits under Section 502(a)(1)(B) should be dismissed." (*Id.*)

Second, contrary to Omega's position, *Montanile* does not restrict United's ability to recover overpayments through cross-plan offsetting. *Montanile* dealt with "limitations on relief available to plans that sue for equitable relief under ERISA § 502(a)(3)" and "are predicated on an interpretation of Section 502(a)(3)'s 'appropriate equitable relief' provision in a litigation setting." (*Id.*) According to United, *Montanile* does not restrict what plan administrators can do to recover overpayments through "non-judicial mechanisms." (*Id.*) United maintains that applying *Montanile* to "non-judicial processes would be unprecedented and absurd, as its limitation on recovery to 'traceable assets' would preclude not only cross-plan recovery but also same-plan offsetting in nearly every case, regardless of plan language." (*Id.* at 27–28.)

Omega responds that the "flaws in [United's] argument" and reliance on *Quality Infusion* are "varied and numerous." (Doc. 139 at 23.) *Quality Infusion* interpreted Texas law, not ERISA.

Further, *Peterson v. UnitedHealth Grp. Inc.*, 913 F.3d 769, 777 (8th Cir.), *cert. dismissed sub nom. UnitedHealth Grp. Inc. v. Peterson*, 140 S. Ct. 339, 205 L. Ed. 2d 264 (2019), rejected United's reliance on *Quality Infusion* as well.  It is United's burden to establish that cross-plan offsetting is authorized by the plan documents, and United has failed to do so.  The plan language relied upon by the Genovese Declaration is unavailing as (1) "this language only addresses recovery of funds from the B patients, not from other patients or plans," and (2) the language fails to deal with any ERISA violations from cross-plan offsetting. (*Id.* at 23–24.)

As to *Montanile* and *Manuel*, Omega asserts that United cites to no authority for the proposition that it has greater rights to enforce cross-plan offsetting outside of litigation than in it. To the contrary, ERISA imposes a fiduciary duty for the administrator to act in the interests of the participants and prohibits them from dealing with assets for their own interest.  This prevents cross-plan offsetting.  *Montanile* and *Manuel* "apply the same historic trust principles in the context of efforts to recover funds." (*Id.* at 25.)  Plaintiff relies in particular on the Supreme Court's discussion of *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006), in *Montanile*.  Additionally, United errs by saying that Omega's position would preclude same plan offsetting, as "certain contractual reimbursement provisions regarding overpayment of benefits have long been valid under ERISA." (*Id.* at 25–26)  Courts have upheld same-plan offsetting, whereas cross-plan offsetting "raises a number of significant ERISA issues," including "conflict of interest of an administrator who offsets benefits between several plans or participants, and questions as to which plan or participant is benefitting from the recovered overpayment." (*Id.* at 26.)  Under the Fifth Circuit's decision in *Manuel*, Omega says, "where the overpayment results from the receipt of benefits that are mistakenly paid, all types of ERISA equitable liens must be enforced against a specifically identified fund in the individual or entity's

possession." (*Id.* (citing *Manuel*, 905 F.3d at 873–74).)  *Montanile* and *Manuel* do not limit the tracing principles to civil actions but rather apply such principles to "comport with the trust remedies traditionally available to plan administrators." (Doc. 139 at 26.)  Finally, under Fifth Circuit jurisprudence, conflicts of interest and claims handling issues must be addressed in the context of a Section 501(a)(1)(B) claim.

United's reply is twofold.  First, *Quality Infusion* controls, and, second, *Montanile* is inapposite.  As to the first, *Quality Infusion*'s "core holding" is that "offsetting language, in the context of a provider assignment of a B-patient claim, 'create[s] a right to privately deduct the amount it previously overpaid [to the provider] from [the provider's] subsequent claims.' " (Doc. 145 at 16 (quoting *Quality Infusion*, 628 F.3d at 730).)  The *Quality Infusion* court specifically recognizes that administrators are not limited to the same-plan as long as there is no language in the plans limiting the contractual setoff rights to the same patient or plan.  The same methods of interpreting plans apply to ERISA as to Texas law.  Only *Peterson* and the Eighth Circuit disagree on this method of interpreting ERISA plans.  Thus, there are two key questions: "(1) whether the plan documents permit cross-plan offsetting and (2) whether cross-plan offsetting violates ERISA even if permitted by the plan documents." (Doc. 145 at 17.)  As to the first, *Quality Infusion* found that this is permissible in the case of plan documents substantially similar to those in the instant case.  As to the second, "no court has held that cross-plan offsetting violates the common-law trust concerns that underlie ERISA when permitted by the plan documents." (*Id.* (citing *Quality Infusion*, 628 F.3d at 730; *Peterson*, 913 F.3d at 777).)

United next argues that *Montanile* arose from cases interpreting the phrase "appropriate equitable relief" in ERISA § 502(a)(3), and *Montanile* is limited to such claims.  Unlike what Omega argues, *Montanile* does not turn on "trust law and the fiduciary duties imposed by ERISA"

(*id.* at 17–18 (quoting Doc. 141-1 at 19)) but rather "what equitable relief was typically available in premerger equity courts," *Montanile*, 136 S. Ct. at 657.  That is, equitable tracing is required of *equity*, not trusts or fiduciaries.  Similarly, in *Manuel*, the Fifth Circuit's discussion of *Montanile* was limited to a § 502(a)(3) counterclaim.  At least one other court has limited *Montanile*, and Omega can point to no other court to read *Montanile* more broadly.

### 2. Analysis

> #### a.  Introduction – A-Patient Claims and the Framework for B-Patient Claims

Having carefully considered the matter, the Court will grant in part and deny in part the motion.  Preliminarily, the Court notes that it granted the *Second Motion to Dismiss* on Count One because Omega had essentially brought claims on behalf of three A-patients who were not adversely affected by the cross-plan offsetting.  Specifically, this Court explained:

> Omega has alleged that the Plans of other, unrelated patients, executed offsets to Omega, that allowed United to recover for the overpayments made to Omega on behalf of SJ, LL, and DB.  While such allegations may create the inference that "unrelated patients" are entitled to those benefits recouped through cross-plan offsetting, they fail to stat a plausible claim that the patients on whose behalf Omega brings this lawsuit—SJ and LL—are entitled to such benefits under ERISA.

> Moreover, as correctly argued by United, in order for Omega to challenge the legality of the cross-plan offsets, it must sue using the rights of patients who are participants in the Plans that executed the offsets.  Based upon the well-pleaded allegations of the *First Amended Complaint*, however, it is clear that Omega has failed to do so.

(Doc. 90 at 32–33.)  The Court finds that this ruling was correct then and remains correct now.  Thus, while the Court did not strike the allegations related to A-patients, the Court emphasizes that such claims, to the extent made (which is questionable, given the Claims Spreadsheet), remain implausible and must be dismissed.

As to the B-patient claims, the Court agrees that *Quality Infusion* controls. There, as here, an insurance company overpaid a provider for certain claims "and then set off the overpayments by underpaying subsequent patient claims, without regard to whether the subsequent claim was from the same patient or under the same insurance plan." *Quality Infusion*, 628 F.3d at 726. The provider argued that the insurer had no "contractual or statutory right to set off overpayments against different patients' claims and because the debts that were offset were not mutual and in the same capacity." *Id.* The insurance company responded that the offsets complied with the insurance contracts and the Texas Insurance Code. *Id.* The district court granted the insurer's motion for summary judgment and found that the "setoffs comported with the language of the Plans and the [Texas] Insurance Code." *Id.*

The Fifth Circuit affirmed, finding that the insurer "had a contractual right under all three plans to deduct overpayments it had previously made to [the provider] from subsequent claims it was obligated to pay [the provider]." *Id.* at 728. After analyzing each of the relevant plan provisions, the Fifth Circuit found:

> No language in any of the three plans require [the insurer] to confine its contractual setoff rights to deductions from subsequent benefit payments to the same patient or under the same plan. Additionally, [the provider] does not point to any statutory or common law prohibition against such contractually created setoff rights, nor can we find one. Thus, [the insurer] had the right to deduct from subsequent benefit claims to [the provider] the amounts it had previously overpaid [the provider.]

*Id.* at 730.

While *Quality Infusion* applies Texas law and not ERISA, the Court agrees that *Quality Infusion* provides the appropriate framework for analyzing Omega's claims. Thus, there are two key questions: (1) Is cross-plan offsetting permitted by the plan documents? and (2) Is there any "statutory or common law prohibition against such contractually created setoff rights?"

60

*b.*   Do the Plan Documents Allow Cross-Plan Offsetting?

As to the first question, Omega identifies three "categories" of terms and conditions for the plan documents United has produced.  Omega complains that these provisions, which come from the SPDs and COCs, are not plan documents. (*Sec. Amend. Compl.* ¶ 38, Doc. 130.)  For reasons provided above, the Court finds that the SPDs are not plan documents and that the Court cannot determine at this time whether the COCs are plan documents.  Thus, the Court will deny the motion to dismiss without prejudice at this time.

With that said, though the Court is not making a definitive ruling at this time, the Court notes that it has reviewed the three categories of documents Omega identified in its *Second Amended Complaint*, and some allow cross-plan offsetting while others do not.  Specifically, the first category[11] does not authorize cross-plan offsetting.

However, the second category and third category are substantially similar to the three plans at issue in *Quality Infusion*, 628 F.3d at 729–30.   Specifically, the second category provides:

> Right of Recovery
> If the Medical Plan provides benefits to you or a covered dependent that are later determined to be the legal responsibility of another person or company, the Medical Plan has the right to recover these payments from you *or from the person or company who is determined to be legally responsible*. Assignment of your claim to a third party does not exempt you from your responsibility for repaying the plan. You must notify the plan promptly of any circumstance in which a third party may

---

[11] This category states:

> INTERPRETING PLAN PROVISIONS
> Each of the companies that administer Health Care Benefits under the Plan has discretionary authority to determine whether and to what extent Eligible Employees and Eligible Dependents are entitled to benefits that the company administers and to construe all relevant terms, limitations and conditions set forth in this booklet or in any other document or instrument pursuant to which the Plan is established or maintained. A company administering Health Care Benefits under the Plan shall be deemed to have properly exercised this discretionary authority unless the company has acted arbitrarily or capriciously.

(Ex. K, Doc. 135-14 at 81 (quoting UHC_OMEGA_0023804—23997; UHC_OMEGA_00 03744—3999).)  This cannot be read, by itself, to allow cross-plan offsetting.

be responsible for compensating you with respect to an illness or injury that results
in the plan making payments on your behalf

(*Sec. Amend. Compl.* ¶ 40, Doc. 130; Ex. K, Doc. 135-14 at 20 (quoting UHC_OMEGA_0003727)

(emphasis added).)  Omega also quotes the following for the second category:

Overpayments And Recoupment
If you or one of your Covered Dependents or a Provider who furnished medical
services receives benefits under the Medical Plan and it is determined later that you,
your Covered Dependent, or the Provider were not entitled to any or part of such
benefits, *the Plan may seek to recoup the amount of such overpayment from you,
your Covered Dependent, or the Provider at any time after the overpayment is
discovered.* The amount of the overpayment subject to recoupment is the difference
between the amount of medical benefits the Plan actually paid, and the amount that
should have been paid. *Recoupment may be accomplished by offsetting the
overpayment amount against future benefits due.*

(*Sec. Amend. Compl.* ¶ 40, Doc. 130; Ex. K, Doc. 135-14 (quoting UHC_OMEGA_0016355;

UHC_OMEGA_0030151 (emphasis added)).

This echoes a plan provision in *Quality Infusion* which stated:

If and when the Plan determines that benefit payments under the Plan have been
made erroneously but in good faith, the Plan reserves the right to seek recovery of
such benefit payments from the Participant, or Provider of services to whom such
payments were made. The plan reserves the right to offset subsequent benefit
payments otherwise available by the amount of any such overpayments.

*Quality Infusion*, 728 F.3d at 729.  That provision, like the ones in the second category, "does not

specify that the overpayment must be offset against the same patient's future claim, but rather states

that [the plan administrator] reserves the right to offset subsequent benefit payment made to

Participant or Provider." *Id.* at 729–30.  The same result would be warranted here.

Similarly, the third category includes the following language:

Refund of Overpayments
If the Plan pays for Benefits for expenses incurred on account of you, you, or any
other person or organization that was paid, must make a refund to the Plan if:

* The Plan's obligation to pay Benefits was contingent on the expenses incurred being legally owed and paid by you, but all or some of the expenses were not paid by you or did not legally have to be paid by you.
* All or some of the payment the Plan made exceeded the Benefits under the Plan.
* *All or some of the payment was made in error.*
The amount that must be refunded equals the amount the Plan paid in excess of the amount that should have been paid under the Plan. *If the refund is due from another person or organization, you agree to help the Plan get the refund when requested.* If the refund is due from you and you do not promptly refund the full amount owed, the Plan may recover the overpayment by reallocating the overpaid amount to pay, in whole or in part, future Benefits for you that are payable under the Plan. *If the refund is due from a person or organization other than you, the Plan may recover the overpayment by reallocating the overpaid amount to pay, in whole or in part, (i) future Benefits that are payable in connection with services provided to other Covered Persons under the Plan; or (ii) future Benefits that are payment in connection with services provided to persons under other plans for which the Claims Administrator processes payments, pursuant to a transaction in which the Plan's overpayment recovery rights are assigned to such other plans in exchange for such plans' remittance of the amount of the reallocated payment.*

(*Sec. Amend. Compl.* ¶ 41, Doc. 130; Ex. K, Doc. 135-14 (quoting UHC_OMEGA_00

29590—29749) (emphasis added).)

This provision echoes language from *Quality Infusion*.  The third plan provision in that

case stated:

If We make any overpayment, We can recover what We did not owe from the person to whom We made the payment or *from any other appropriate person*. We have this right even if the mistake was Our fault. *If the overpayment was made to You, We have the right to deduct it when We pay Your claims.* By "overpayment," We mean any payment or part of any payment that is not authorized by the terms of this Policy. We do not have the right to recover from You any overpayment that was fraudulently obtained by another person without Your knowledge.

*Quality Infusion*, 728 F.3d at 730 (emphasis added).  The appellate court found the first sentence

"clearly states that BCBS may recover any overpayment it makes from the 'person to whom

[BCBS] made the payment or any other appropriate person.' " *Id.* Similarly, in *Quality Infusion*,

the insurer made an overpayment from the provider and sought to recover that overpayment from

the provider.  As to the third sentence, the Fifth Circuit concluded, "When reading this sentence

with this patient assignment in mind, we must reasonably interpret this sentence as creating a right to privately deduct the amount it previously overpaid QIC from QIC's subsequent claims." *Id*

The same reasoning applies here. The third category "clearly" states that "If the refund is due from a person or organization other than you, the Plan may recover the overpayment by reallocating the overpaid amount to pay, in whole or in part, (i) *future Benefits that are payable in connection with services provided to other Covered Persons under the Plan*;" (*Sec. Amend. Compl.* ¶ 41, Doc. 130; Ex. K, Doc. 135-14 (quoting UHC_OMEGA_00 29590—29749) (emphasis added).) When read with "patient assignment[s] in mind," the Court must "reasonably interpret this sentence as creating a right to privately deduct the amount it previously overpaid [providers] from [those provider's] subsequent claims." *Quality Infusion*, 728 F.3d at 730. Further, again, like the other plan provisions in *Quality Infusion*, these provisions "do[] not specify that the overpayment must be offset against the same patient's future claim, but rather states that [the plan administrator] reserves the right to offset subsequent benefit payment made to Participant or Provider." *Id.* at 729–30.

In sum, if the plans incorporate the terms in the second and third categories, then United likely satisfies the first requirement of the *Quality Infusion* test.

### c.   Does ERISA bar cross-plan offsetting?

As to the second issue in the *Quality Infusion* test, Omega has identified no provision of ERISA that prohibits cross-plan offsetting. Preliminarily, the Court notes the *Quality Infusion* court's strong statement that it was aware of no "statutory or common law prohibition against such contractually created setoff rights." *Quality Infusion*, 628 F.3d at 730. Additionally, the Court notes the fact that the out-of-circuit decision *Peterson*, which Omega relies upon, stopped short of finding cross-plan offsetting was a violation of ERISA. *See Peterson*, 913 F.3d at 776–77 ("While

64

we need not decide here whether cross-plan offsetting necessarily violates ERISA, at the very least it approaches the line of what is permissible. . . . Regardless of whether cross-plan offsetting necessarily violates ERISA, it is questionable at the very least.").

But, even putting these points aside, the Court agrees with United that *Montanile* involved an interpretation of Section 502(a)(3), not broader limitations of what insurers could include in plans. The *Montanile* summarized its holding in the opening paragraphs as follows:

> When a third party injures a participant in an employee benefits plan under [ERISA], the plan frequently pays covered medical expenses. The terms of these plans often include a subrogation clause requiring a participant to reimburse the plan if the participant later recovers money from the third party for his injuries. And under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), plan fiduciaries can file civil suits " to obtain . . . appropriate equitable relief . . . to enforce . . . the terms of the plan."

> In this case, we consider what happens when a participant obtains a settlement fund from a third party, but spends the whole settlement on nontraceable items (for instance, on services or consumable items like food). We evaluate in particular whether a plan fiduciary can sue under § 502(a)(3) to recover from the participant's remaining assets the medical expenses it paid on the participant's behalf. We hold that, when a participant dissipates the whole settlement on nontraceable items, the fiduciary cannot bring a suit to attach the participant's general assets under § 502(a)(3) because the suit is not one for "appropriate equitable relief." In this case, it is unclear whether the participant dissipated all of his settlement in this manner, so we remand for further proceedings.

*Montanile*, 577 U.S. at 138–39, 136 S. Ct. at 655.  Thus, the question was "whether an ERISA fiduciary can enforce an equitable lien against a defendant's general assets under the[] circumstances," *id.*, at 141, 136 S. Ct. at 656, and this required an examination of what sort of equitable relief was available "before 1938 when courts of law and equity were separate." *Id.*, at 142, 136 S. Ct. at 657.  Relying in part on *Sereboff*, the Supreme Court explained how the plan fiduciary in *Montanile* had an equitable lien by agreement that attached to the settlement funds,

and the plan's remedy was that it could sue to enforce the lien against the settlement funds in the plaintiff's possession. *Id.*, at 144, 136 S. Ct. at 658. But, that did not resolve the issue because:

> [A] plaintiff could ordinarily enforce an equitable lien only against specifically identified funds that remain in the defendant's possession or against traceable items that the defendant purchased with the funds (e.g., identifiable property like a car). A defendant's expenditure of the entire identifiable fund on nontraceable items (like food or travel) destroys an equitable lien. The plaintiff then may have a personal claim against the defendant's general assets—but recovering out of those assets is a *legal* remedy, not an equitable one.

*Id.*, at 144–45, 136 S. Ct. at 658. The Supreme Court went on to hold that the lower courts erred in holding that the plan could recover from the plaintiff's general assets in its equity-based § 502(a)(3) claim and remanded to determine whether the plaintiff "kept his settlement funds separate from his general assets or dissipated the entire fund on nontraceable assets." *Id.*, at 150–51, 136 S. Ct. at 662.

Thus, Omega's reliance on *Montanile* is misplaced. As United argues, the Supreme Court's primary focus was a § 502(a)(3) claim and the remedies available to it through litigation. *See Montanile*, 577 U.S. at 138–39, 136 S. Ct. at 655 ("We evaluate in particular whether a plan fiduciary *can sue under § 502(a)(3)* to recover from the participant's remaining assets the medical expenses it paid on the participant's behalf. . . . . We hold that, when a participant dissipates the whole settlement on nontraceable items, *the fiduciary cannot bring a suit* to attach the participant's general assets under § 502(a)(3) because *the suit is not one for 'appropriate equitable relief.*'").

Indeed, the Supreme Court acknowledges that ERISA plans can be constructed to prevent the seemingly harsh limitations of lawsuits based on § 502(a)(3). The High Court specifically stated:

> [O]ur interpretation of § 502(a)(3) promotes ERISA's purposes by allocat[ing] liability for plan-related misdeeds in reasonable proportion to respective actors' power to control and prevent the misdeeds. More than a decade has passed since we decided *Great–West*, and plans have developed safeguards against participants'

66

and beneficiaries' efforts to evade reimbursement obligations. Plans that cover medical expenses know how much medical care that participants and beneficiaries require, and have the incentive to investigate and track expensive claims. Plan provisions—like the ones here—obligate participants and beneficiaries to notify the plan of legal process against third parties and to give the plan a right of subrogation.

*Montanile*, 577 U.S. at 150, 136 S. Ct. at 662.   Thus, plan administrators can implement "safeguards" to ensure the payment of "reimbursement obligations," and cross-plan offsetting is akin to the types of provisions detailed by the Supreme Court.

Additionally, United is much closer to the mark than Omega in arguing that the main focus in *Montanile* is equity.   For example, the Supreme Court's discussion of *Sereboff* is focused not on the "historic trust remedies that define the powers of the plan administrator" (Doc. 139 at 25) but rather on (1) the fact that "the basis for the plan's claim was equitable because the plan sought to enforce an equitable lien by agreement, a type of equitable lien created by an agreement to convey a particular fund to another party," *Montanile,* 577 U.S. at 143, 136 S. Ct. at 658 (citing *Sereboff*, 547 U.S. at 363–64, 126 S. Ct. 1869), and (2) how "the underlying remedies that the plan sought [in *Sereboff*] were equitable, because the plan sought specifically identifiable funds that were within the possession and control of the beneficiaries—not recovery from the beneficiaries assets generally," *id.,* at 144, 136 S. Ct. at 658 (cleaned up) (citing *Sereboff*, 547 U.S. at 362–63, 126 S. Ct. 1869) .   Further, as demonstrated amply above, *Montanile* also focused on the types of remedies available at equity and the impact this had on an ERISA § 502(a)(3) claim. *See id.*, at 141–42, 144–45, 136 S. Ct. at 656–68.   In short, *Montanile* is no bar to cross-plan offsetting.

Neither is *Manuel*.   There, the plan argued that it paid benefits to the plaintiff in error, and the district court found that the insurer was entitled "under ERISA § 502(a)(3), to repayment." *Manuel*, 905 F.3d at 873.   The district court had attempted to distinguish *Montanile* by finding that "*Montanile*'s limitation of equitable recovery from a defendant's general assets applies only to

67

defendants who received funds from third parties (e.g., in settlement of claims) and not to defendants who received overpayments directly from the party seeking repayment." *Id.* The Fifth Circuit reversed and relied on *Montanile*'s conclusion that "*all* types of equitable liens must be enforced against a specifically identified fund in the defendant's possession." *Id.* at 874 (quoting *Montanile*, 136 S. Ct. at 659). The appellate court remanded to "determine whether [plaintiff] kept his [benefits] separate from his general assets or dissipated the entire [amount] on nontraceable assets." *Id.* (quoting *Montanile*, 136 S. Ct. at 662). Thus, *Manuel* deals with a § 503(a)(3) claim in litigation and provides no limitation on what parties can agree to in ERISA plans with respect to cross-plan offsetting.

### *d.* Summary

In sum, *Quality Infusion* provides the correct framework: (1) Is cross-plan offsetting allowed by the plan? and (2) Does cross-plan offsetting violate ERISA? As to the first, while the second and third categories of plan provisions described in the *Second Amended Complaint* appear to allow cross-plan offsetting, United has failed to establish that these "plan documents" are actually part of the plan. Thus, United's motion will be denied without prejudice. However, while the Court makes no definitive ruling, it notes that *Montanile* and *Manuel* do not bar cross-plan offsetting, and Omega has pointed to no other provision of ERISA that would do so.

### **D.  Breach of Contract Claim**

#### *1. Parties' Arguments*

United next argues that, to the extent Omega asserts common law causes of action in Counts Three and Four, they are preempted and fail as a matter of law. Concerning preemption, Count Three seeks declaratory and injunctive relief rooted in United's alleged failure to comply with ERISA requirements. As a result, "Count Three unquestionably 'relates' to ERISA, and is

thus preempted by it." (Doc. 135-1 at 29 (citation omitted).)  Additionally, the Court has, according to United, already held that a breach of contract claim was preempted when it dismissed Omega's original complaint. (*Id.* at 29–30 (citing Doc. 38 at 7).)

Additionally, United contends that Plaintiff has failed to state a viable claim for breach of contract.  First, Omega has failed to allege a specific term of the plan that was breached.  Second, Omega has failed to allege any damages.  Specifically, Omega alleged that United's overpayment audits occur " 'so long after treatment that the out-of-network provider has no ability to obtain payment of the balance owed [from A-patients].' " (*Id.* at 30 (quoting *Sec. Amend. Compl.* ¶ 9, Doc. 130).)  Omega further claims that, "when United recovers overpaid monies from Omega through offsetting, 'Omega cannot pursue the B-patient for the balance.' " (*Id.* (quoting *Sec. Amend. Compl.* ¶ 13, Doc. 130).)  Thus, Omega has foreclosed any allegation of harm from the breach of contract.

Finally, the Court previously dismissed Omega's claims for prospective relief. (Doc. 90 at 26–27.)  "To the extent that Omega seeks to side-step the Second Dismissal Order by bringing a declaratory judgment claim under state law, these arguments fail as § 502(a) provides the exclusive remedy for enforcing ERISA." (Doc. 135-1 at 31 (citation omitted).)

Omega responds first by saying it need not discuss Count Three's claim for declaratory and injunctive relief in detail, as United "devotes few resources" to these arguments.  Omega states that "only Count Four of the [*Second Amended Complaint*] is asserted under state law." (Doc. 139 at 27.)  Omega then incorporates its other arguments on Count Three, detailed above.

Omega next argues that its breach of contract claim is not preempted and plausible.

Omega's breach of contract claim is predicated upon agreements made between Omega personnel and United's representatives, independent of Omega's relationships with the United patient/members or the plan terms.  In particular, Omega alleges both in the Complaint and in the attached Declaration that for each

69

> claim its personnel routinely contacted United to verify not only coverage for the procedure but also the rate of payment Omega would receive for its professional medical services. . . . As a consequence of the unilateral actions engaged in by United, Omega did not receive the rate of payment it was promised and agreed to accept.

(*Id.* at 27–28.)  Preemption depends on what rights Omega seeks to enforce and what is allegedly breached.  Omega cites to certain case law which recognized state law breach of contract claims in similar situations where insurance companies made representations about reimbursement rates.  Further, in a different action involving these parties, the Eastern District of Louisiana found that claims implicating the rate of payment rather than the right to payment are not preempted by ERISA. (*Id.* at 29 (citing *Omega Hosp., LLC v. United HealthCare Ins. Co.*, No. 15-561, 2015 U.S Dist. LEXIS 56905, at *6–7 (E.D. La. April 30, 2015)).)  Similarly:

> Omega's breach of contract claim does not attempt to enforce rights arising under an ERISA plan.  The breach of contract claim does not implicate coverage and benefits established by the terms of an ERISA benefit plan;  rather, it relates to the computation of contract payments or, in this case, the correct execution of such payments.  The former may constitute claims for benefits that could be brought pursuant to § 502(a)(1)(b), while the latter is an independent contractual obligation between the provider and the health insurer.

(*Id.* at 29–30.)  Based on the similar cases detailed above, Omega urges that the state law breach of contract claims are not preempted and are sufficiently pled.

United replies that the breach of contract claim must be dismissed.  According to United, the *Second Amended Complaint*'s Count Four alleges that United breached the plan, and United sought to dismiss this as preempted and as implausible.  United asserts, "Omega does not attempt to defend Count Four of the [*Second Amended Complaint*] *as pleaded*."  Instead, in its Opposition, Omega advances an entirely *new* breach of contract theory based on an alleged oral contract." (Doc. 145 at 19 (citing Doc. 141-1 at 22-25).)  United maintains that, by failing to respond to the claim as pled in the operative complaint, Omega has conceded that Count Four is preempted and

fails as a matter of law.  The new allegations should be treated as a motion to amend the complaint, and Omega should be denied such a request, as each of the factors used to consider whether an amendment should be granted cuts against Omega.  In particular, there has been undue delay in this case because Omega has now amended its complaint three times. In any event, the new breach of contract theory is preempted as well and thus should be rejected as futile.

### 2. Analysis

As a preliminary note, this Court dismissed Count Three, *supra*, for lack of standing.  Thus, the only remaining issue is whether to grant United's motion as to Count Four.  In short, the Court will do so.

"[A] motion to dismiss is evaluated on the operative complaint, not a plaintiff's opposition." *Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 677–78 (M.D. La. 2019) (deGravelles, J.) (citing *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 806 (5th Cir. 2012) (stating that, on a Rule 12(b)(6) motion, "a court assesses the legal sufficiency of the complaint"); *Becnel v. St. Charles Par. Sheriff's Office*, No. 15-1011, 2015 WL 5665060, at *1 n.3 (E.D. La. Sept. 24, 2015) (refusing to consider "new factual allegations" presented by plaintiff in her opposition to defendants' motion to dismiss because " '[i]t is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss.' " (citing *In re Enron Corp Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011))).  Thus, regardless of how Omega characterizes Count Four in its opposition, only the *Second Amended Complaint* controls.

Having reviewed the *Second Amended Complaint*, the Court finds that United's description of Count Four is much closer to the mark than Omega's.  In Count Four, the operative complaint alleges how plan beneficiaries enter into a contract with United by enrolling in ERISA health plans

that contain certain coverages and benefits, and the plan beneficiaries pay a premium as consideration for those benefits. (*Sec. Amend. Compl.* ¶ 87, Doc. 130.)  United has discretionary authority to interpret the plan and make eligibility or benefit determinations in addition to "factual determinations about claims arising under ERISA health plans." (*Id.* ¶ 88.)  Omega alleges that "[n]one of the United plans at issue in this case contain terms and conditions allowing for cross-plan offset of other fund offset or alleged overpayments to either Omega or to the Class members." (*Id.* ¶ 89.)  Omega avers, "By improperly and unlawfully retaining and continuing to retain, offsetting and continuing to offset reimbursements previously paid to Omega and to the Class members, United has breached the plan contract between United and the plan beneficiaries (and their healthcare providers where acting pursuant to a valid assignment)." (*Id.* ¶ 90.)  Plaintiff claims that they have suffered damages from these breaches in an amount to be determined at trial. (*Id.* ¶ 91.)  In sum, the Court agrees with United that Omega's opposition has urged a new theory outside of the *Second Amended Complaint*.

Consequently, the Court will reject Omega's original theory on the ground of waiver.  "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (citing *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10 (S.D. Tex. 2003)); *see also United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver").  "By analogy, failure to brief an argument in the district court waives that argument in that court." *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp. 2d at 748 n. 10); *see also Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014)

("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue."
(citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex.
Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to
respond to defendants' motion to dismiss on this issue and thus waived the argument).  Here,
Omega completely failed in its opposition to respond to the substance of United's arguments on
Count Four, and, on that ground alone, the Court could dismiss Omega's claim. *See JMCB*, 336 F.
Supp. 3d at 634 (finding that operative complaint could be dismissed because plaintiff failed to
respond to the substance of defendant's arguments); *Apollo*, 387 F. Supp. 3d at 672 (finding that
policy exclusion could apply because plaintiff failed to oppose insurer's argument on the issue).

Nevertheless, even if the Court were to look past the waiver, the Court finds that Count
Four *as pled* is preempted.  ERISA Section 514(a) provides:

> Except as provided in subsection (b) of this section, the provisions of this
> subchapter and subchapter III of this chapter shall supersede any and all State laws
> insofar as they may now or hereafter relate to any employee benefit plan described
> in section 1003(a) of this title and not exempt under section 1003(b) of this title.

*Woods v. Texas Aggregates, L.L.C.*, 459 F.3d 600, 602 (5th Cir. 2006) (citing 29 U.S.C. § 1144(a)).
"In analyzing preemption issues under § 514(a), we first ask whether the benefit plan at issue
constitutes an ERISA plan; if it is, we must then determine whether the state law claims 'relate to'
the plan." *Id.* (citing *Hernandez v. Jobe Concrete*, 282 F.3d 360, 362 n.3 (5th Cir. 2002)). Here,
the parties do not dispute the first question; the plan is governed by ERISA. To assess whether
state law claims "relate to" a plan, the Court must determine "(1) whether the state law claims
address areas of exclusive federal concern, such as the right to receive benefits under the terms of
an ERISA plan; and (2) whether the claims directly affect the relationship among the traditional
ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries."
*Id.* (citing *Mem. Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990)).

As United urges, several courts have found that claims which are essentially for benefits "relate to" an ERISA plan and are thus preempted. *See Magee*, 261 F. Supp. 2d at 747–48 ("The relief Magee requests is fundamentally for payment of long-term disability benefits under the Plan. This claim is clearly 'related to' an ERISA plan. Magee's exclusive remedy to recover benefits is 29 U.S.C. § 1132(a)." (citing *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987); *Memorial Hosp. Sys.*, 904 F.2d at 250); *Poe v. United Ass'n of Journeyman & Apprentices of the Plumbing & Pipefitting Indus. of the United States of Am. AFL-CIO Local 198 Health & Welfare Fund*, No. 18-0667, 2019 WL 4855158, at *6 (M.D. La. Oct. 1, 2019) ("An analysis of [the *Woods*] factors indicates that Plaintiffs' breach of contract claim is preempted. Plaintiffs' claim directly involves their right to receive benefits under the ERISA Plan. Although Plaintiffs claim that Defendants inserted the discretionary language without their permission, ultimately, the claim still involves benefits to which they are entitled under the Plan.").

The same reasoning applies here. Again, at its essence, Plaintiff's Count Four as pled is a claim for benefits. As a result, Omega's state law breach of contract claim is preempted.

The sole remaining question then is whether to allow Plaintiff leave to amend to assert the Count Four set out in its opposition. Federal Rules of Civil Procedure 15(a) "requires the trial court to grant leave to amend freely," and "the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., LP,* 427 F.3d 987, 994 (5th Cir. 2005) (internal citations omitted). However, "leave to amend is in no way automatic, but the district court must possess a 'substantial reason' to deny a party's request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (citing *Jones*, 427 F.3d at 994). The Fifth Circuit further described the district courts' discretion on a motion to amend as follows:

74

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." *Jones*, 427 F.3d at 994. (citation omitted).

*Id.*, 751 F.3d at 378.

Having carefully considered the matter, the Court will exercise its discretion to deny leave to amend Count Four.  Plaintiff is on its third iteration of its complaint.  Additionally, the Court has already dismissed two prior complaints, and, the first time, it found that "all state law claims are preempted by ERISA."(Doc. 38 at 7–8.)  Thus, there have been repeated failures to cure amendments previously allowed, some of which involve state law claims dismissed on the same ground as the Court has done on this motion. *See Apollo Energy*, 387 F. Supp. 3d at 679 (citing this as factor in denying leave to amend when "plaintiff should have had notice of the . . . issue from the Court's prior Ruling and Order").

Additionally, the Court finds that undue delay is a factor weighing against amendment. This case has been pending over four years, since August 24, 2016 (Doc. 1).  Again, Omega has had the benefit of two rulings on motions to dismiss (Docs. 38, 90), one ruling on a motion for reconsideration (Doc. 103), and limited discovery (Docs. 108, 113).  Omega has had ample opportunity to assert breach of contract claims, and it has failed to do so.  Consequently, the Court will deny Omega any leave to amend.

## V.      Motion to Strike Jury Demand

Though Omega made a jury demand (*Sec. Amend. Compl.* ¶ 91), Omega states in its opposition that it "acknowledges that most of its claims asserted herein are not triable by jury and assents to the withdrawal of its jury trial request as to any claim that might have been triable by

jury, thereby mooting further discussion of this issue." (Doc. 139 at 30.)  Accordingly, the jury

demand will be withdrawn, and the motion to strike it will be denied as moot.

**VI.    Conclusion**

Accordingly,

**IT IS ORDERED** that the *Defendants' Motion to Dismiss the Second Amended Complaint*

*and to Strike Portions of the Second Amended Complaint* (Doc. 135) filed by Defendants United

HealthCare Services, Inc. and United Healthcare of Louisiana, Inc. is **GRANTED IN PART** and

**DENIED IN PART.**

**IT IS FURTHER ORDERED** that Omega's claims under Count Three for Declaratory

and Injunctive Relief are **DISMISSED WITHOUT PREJUDICE** for lack of standing.

**IT IS FURTHER ORDERED** that Omega's A-patient claims are **DISMISSED WITH**

**PREJUDICE** for failure to state a claim.

**IT IS FURTHER ORDERED** that Omega's claims under Court Four for State Law

Breaches of Contract are **DISMISSED WITH PREJUDICE** as waived and preempted.

**IT IS FURTHER ORDERED** that United's request to strike the jury demand is **DENIED**

**AS MOOT**, as Omega has withdrawn any request for trial by jury.

**IT IS FURTHER ORDERED** that, in all other respects, United's motion is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>December 1, 2020</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**